UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA : 
: 
v. : CRIMINAL NO. CR07-129ML
: 
GERARD M. MARTINEAU : In violation of 18 U.S.C. §§ 1341 and 1346

FILED
OCT 09 2007
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

**INFORMATION**

The United States of America charges:

**Introduction**

At all times material to this Information:

**A. The Defendant**

1. From on or about January 2, 1987, through on or about December 31, 2002, defendant, GERARD M. MARTINEAU ("MARTINEAU") was a State Representative elected to the Rhode Island General Assembly. From on or about January 2, 1993, through on or about June 25, 1998, MARTINEAU served as Chairman of the House Committee on Corporations ("Corporations Committee"). MARTINEAU served as the House Majority Leader ( "Majority Leader") from on or about June 25, 1998 through on or about December 31, 2002. In 2002 MARTINEAU did not seek re-election and his term in office expired on December 31, 2002.

2. The Corporations Committee possessed jurisdiction over legislation and matters affecting commerce, for-profit as well as not-for-profit business corporations, including but not limited to, health care related insurance companies and pharmacies. As Chairman, MARTINEAU had the power to control the conduct of business, meetings and hearings in the Corporations Committee as well as to set the agenda for the Corporations Committee. Therefore,

as Chairman, unless he formally and publicly recused himself, MARTINEAU participated in, influenced and affected all proposed legislation assigned to his committee.

3. The Majority Leader was an elected leadership position in the Rhode Island House of Representatives. The Majority Leader was elected by a simple majority of votes cast by members of the majority party in the House. The Majority Leader was a senior leadership position in the House. As Majority Leader, MARTINEAU assisted in setting the House Calender, appointed standing committees, and had the power to vote in every committee of the House. Therefore, as Majority Leader, unless he formally and publicly recused himself, MARTINEAU had the power to participate in, influence and affect all proposed legislation considered by the House of Representatives.

4. The State of Rhode Island and its citizens had an intangible right to the honest services of its officials and employees. As an elected public official of the State, MARTINEAU therefore owed the State and its citizens a duty to: (a) refrain from receiving payments and benefits that would (i) improperly affect the performance of his official duties or (ii) influence his favorable official action or inaction and (b) disclose conflicts of interest and other material information in matters over which he exercised influence, authority, and discretion that resulted in his personal gain.

5. The Rhode Island Ethics Commission ("Ethics Commission") was an independent commission created by the State of Rhode Island charged with ensuring that public officials and employees adhered to the highest standards of ethical conduct, respected the public trust and the rights of all persons, were open, accountable, responsive, avoided the appearance of impropriety, and did not use their position for private gain or advantage. In June of 1987, the Rhode Island

General Assembly enacted the Rhode Island Code of Ethics in Government ("Code of Ethics"). the Ethics Commission had the authority to investigate violations and enforce its provisions. The Ethics Commission also possessed the authority to issue advisory opinions relating to requirements under the Code of Ethics.

**B. <u>The Corporations</u>**

**1. <u>The Pharmacy</u>**

6. A corporation, the identity of which is known to the United States of America, that operated a retail pharmacy chain ("Pharmacy"), was a for-profit corporation incorporated under the laws of the State of Delaware. Every year between 1999 and 2002 legislation was pending before the Rhode Island General Assembly, including the House of Representatives and the Corporations Committee, which could result in financial gains or losses to the Pharmacy.

7. Persons whose identities are known to the United States of America, as well as other individuals known and unknown, were employed as executives by the Pharmacy ("Pharmacy Executives"). Some Pharmacy Executives, whose identities are known to the United States of America, were assigned to duties in the Government Affairs Department of the Pharmacy ("Pharmacy Government Affairs Department").

8. The Pharmacy also contracted with a private law firm, the identity of which is known to the United States of America, for lobbying services and utilized the services of partners, associates, employees and staff of that firm, whose identities are known by the United States of America, as outside or contract lobbyists ("contract lobbyists").

### 2. The Health Insurance Company

9. A corporation, the identity of which is known to the United States of America, that provided health insurance ("Health Insurance Company"), was a not-for-profit corporation incorporated under the laws of the State of Rhode Island as a hospital service corporation. Every year between 1999 and 2002, legislation was pending before the Rhode Island General Assembly, including the House of Representatives, and the Corporations Committee which could result in financial gains or losses to the Health Insurance Company.

10. Persons whose identities are known to the United States of America, as well as other individuals known and unknown, were employed as executives by the Health Insurance Company ("Health Insurance Company Executives"). Some Health Insurance Company Executives, whose identities are known to the United States of America, were assigned to duties in the Legislative Affairs Department of the Health Insurance Company ("Health Insurance Company Legislative Affairs Department").

11. The Health Insurance Company also contracted with the same private law firm as the Pharmacy for lobbying services and utilized the services of partners, associates, employees and staff of that firm, whose identities are known by the United States of America as outside or contract lobbyists ("contract lobbyists").

## C. Martineau's Alter Ego: The Upland Group

12. In or around 1997 and 1998, MARTINEAU created a sole proprietorship that he called "The Upland Group." The Upland Group was not a group of any sort. It was not incorporated. The Upland Group neither owned nor operated any production or manufacturing facilities of any kind. No persons or entities, other than MARTINEAU, had any ownership

interest in the business. It had no employees other than MARTINEAU. "Upland" was the name of the street that MARTINEAU resided on in Woonsocket, Rhode Island. The business address was his home address. The Upland Group was an alter ego for MARTINEAU, who was doing business under the name The Upland Group.

**D. <u>Freedom of Choice Legislation in Rhode Island</u>**

13. The Health Insurance Company, which was the largest healthcare insurer in Rhode Island, contracted with a wholly owned subsidiary of the Pharmacy to manage pharmaceutical benefits for the Health Insurance Company as a Pharmaceutical Benefits Manager ("PBM"). The PBM managed a network of pharmacies which included the Pharmacy. Those pharmacies that were chosen and allowed to participate in the network distributed pharmaceuticals for the Health Insurance Company under a restricted benefit plan. The plan caused insured patients to get prescriptions filled at participating pharmacies within the restricted network, including the Pharmacy. The Pharmacy, which was the largest provider in the network and which was the PBM's parent company, financially benefitted from this restrictive network through the increased sales of prescription drugs and by the additional revenue generated by sales of other goods to consumers who were required by the plan to visit Pharmacy stores to get prescriptions filled. The Health Insurance Company financially benefitted from this restrictive network through volume discounts and reduced prices for prescription drugs.

14. Beginning in or about 1995, legislation was proposed in the Rhode Island General Assembly to allow those with pharmaceutical health insurance benefits to choose their own pharmacy, or to permit any pharmacy that was willing to accept the reimbursement rate to participate in the restricted network. That proposed legislation, in the form of several similar

legislative bills, was sometimes known as "Any Willing Provider," "AWP," "Pharmacy Freedom of Choice" or simply "Freedom of Choice" legislation ("Freedom of Choice").

15. The Health Insurance Company and the Pharmacy were opposed to Freedom of Choice which they believed would have negatively impacted the financial advantage enjoyed by both companies in the restricted network. Independent pharmacies and other pharmacy chains, that were not allowed to participate in the network, supported Freedom of Choice because they believed they were financially disadvantaged by being excluded from the network.

16. Freedom of Choice generally enjoyed overwhelming success in the House of Representatives between 1995 and 1998 but was defeated in the Senate. Until 1998 MARTINEAU supported Freedom of Choice.

**COUNT I**

**The Health Insurance Company Scheme**

**(Honest Services Mail Fraud - 18 U.S.C. §§ 1341 and 1346)**

17. The allegations contained in paragraphs 1 through 16 are incorporated by reference.

**A. The Scheme to Defraud**

18. From in or about January 2, 1998, through in or about June, 2003, in the District of Rhode Island and elsewhere, MARTINEAU knowingly devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to his honest services and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment, and used the United States mails in furtherance of the

scheme and artifice to defraud.

B. **Manner and Means**

19. It was part of the scheme and artifice to defraud that MARTINEAU had undisclosed and improper conflicts of interest which deprived the State of Rhode Island and its citizens of their intangible right to his honest services, in that he obtained money from the Health Insurance Company while that company had a financial interest in legislation and matters pending before the Rhode Island General Assembly, the House of Representatives, and the Corporations Committee.

20. It was further part of the scheme and artifice to defraud that MARTINEAU was influenced and affected in his official actions as a State Representative, Chairman of the Corporations Committee and Majority Leader, in a manner which benefitted the Health Insurance Company, including but not limited to, using his influence, power and authority to take official actions and to refrain from taking official actions all to benefit the Health Insurance Company as well as to influence other legislators to act or fail to act in such a way as to benefit the Health Insurance Company.

21. It was further part of the scheme and artifice to defraud that MARTINEAU intentionally deceived the State of Rhode Island and its citizens by, among other things, failing to disclose the conflicts of interests created by his financial relationship with the Health Insurance Company in order to continue to participate in the legislative process, using his power, influence and authority to favorably affect legislation of importance to the Health Insurance Company without public knowledge and scrutiny of his financial relationship with the Health Insurance Company.

## C. Execution of the Scheme

### 1. Martineau's Business With the Health Insurance Company

22. Early in the 1998 legislative session, MARTINEAU solicited business for his newly created company, The Upland Group, from the Health Insurance Company through a Health Insurance Company Executive. At the time MARTINEAU solicited business from the Health Insurance Company Executive both were present at the Rhode Island State House on official business. MARTINEAU was present as Chairman of the Corporations Committee and the Health Insurance Company Executive, who was a registered lobbyist, was lobbying on behalf of the Health Insurance Company.

23. As a result of this solicitation, the Health Insurance Company Lobbyist referred MARTINEAU to a Health Insurance Company Assistant Vice President ("Contracting AVP"), to facilitate the formation of a business relationship between the Health Insurance Company and MARTINEAU.

24. In the late spring or early summer of 1998, MARTINEAU met with the Contracting AVP and proposed that the Health Insurance Company purchase paper prescription bags through him. Although the Health Insurance Company did not use any bags in their business, MARTINEAU proposed that the Health Insurance Company could place advertisements on the bags and provide them free of charge to independent pharmacies as part of an advertising campaign. MARTINEAU proposed that the first order should be for one million bags and set the price at $19,500.00 per million bags.

25. Without comparing prices, obtaining other bids, analyzing the effectiveness of the advertising approach, determining specifically where the bags were to be delivered, or assessing

the need for the quantity of bags proposed by MARTINEAU, but after obtaining approval from a Health Insurance Company Executive Vice President, the Health Insurance Company began purchasing bags from The Upland Group. MARTINEAU derived income from those purchases.

26. On or about December 21, 1998, six months after he became House Majority Leader and two weeks prior to the start of the 1999 legislative session, MARTINEAU sent his first invoice to the Health Insurance Company for $19,500.00, on Upland Group stationary, for one million paper prescription bags. Neither MARTINEAU's name nor signature appear on the invoice.

27. Thereafter, from 1998 to 2003, the Health Insurance Company continued to pay The Upland Group for paper prescription bags ordered in lots of one million to three million paper prescription bags whenever MARTINEAU invoiced the Health Insurance Company. Over the course of this financial relationship, the Health Insurance Company paid MARTINEAU a total of approximately $175,000.00.

## 2. Legislative and Financial Dealings Between MARTINEAU and the Health Insurance Company By Session

### a. The 1999 Legislative Session

28. On or about January 5, 1999, the first day of the 1999 legislative session, the Health Insurance Company issued a purchase order for the first 1 million paper prescription bags from the Upland Group.

29. On or about January 12, 1999, a Freedom of Choice Bill (99-H5061), was introduced in the House and was referred to the Corporations Committee.

30. On or about January 19, 1999, the first Health Insurance Company check was issued to The Upland Group for $19,500.00. The check was mailed to MARTINEAU's home address and was later deposited in a bank account that MARTINEAU had opened in the name The Upland Group.

31. Between on or about January 26, 1999, and February 2, 1999, three other Freedom of Choice Bills (99-H5269, 99-H5400, and 99-H5868) were introduced in the House.

32. On or about January 27, 1999, a contract lobbyist for the Health Insurance Company and a contract lobbyist for the Pharmacy Company conferred with "Majority Leader MARTINEAU regarding Health Insurance Company Legislation."

33. On or about February 24, 1999, a contract lobbyist and a Senior Health Insurance Company Executive met with MARTINEAU regarding Freedom of Choice and other legislative matters of interest to the Health Insurance Company.

34. On or about March 1, 1999, MARTINEAU gave an interview to a reporter that resulted in a published article in which MARTINEAU publicly stated that he had changed his opinion on Freedom of Choice Legislation, indicating that he now believed the new pharmacy contract had ample protection for both independent pharmacies and consumers against chain monopolies. MARTINEAU did not disclose that he was now being paid by the Health Insurance Company.

35. On or about April 1, 1999, the Corporations Committee held a hearing on Freedom of Choice Bills: 99-H5868, 99-H5061, 99-H5269 and 99-H5400. Witnesses included employees and lobbyists for the Health Insurance Company and the Pharmacy opposing Freedom of Choice as well as representatives of companies favoring the legislation.

36. Although Freedom of Choice legislation had overwhelmingly passed in the Corporations Committee and the full House in past years, this year, on April 8, 1999, the Corporations Committee voted 17-0 recommending the defeat of Freedom of Choice. This year, MARTINEAU was opposed to Freedom of Choice and used his power, influence and authority as Majority Leader to influence the outcome of that legislation and the vote of other legislators to obtain that result.

37. On or about April 14, 1999, a contract lobbyist for the Health Insurance Company met with MARTINEAU regarding "The Health Conversion Act." At that time, the Health Insurance Company was experiencing financial difficulties and was exploring the possibility of being acquired by a for-profit corporation. The Health Conversion Act would have affected the approval process required for the Health Insurance Company to be acquired by a for-profit corporation.

38. On or about June 9, 1999, MARTINEAU was the primary sponsor of An Act Relating to Health Insurance Conversion (99-H6561) which created the Health Insurance Conversion Act. The purpose of the Act was to require approval of the Rhode Island Department of Business Regulation prior to the conversion of a health insurance organization or corporation. Subsequent to a conversion, health insurance rates would be regulated subject to certain requirements. The Senate companion Health Insurance Conversion Act was 99-S1005.

39. On or about June 14, 1999, a contract lobbyist for the Health Insurance Company met with Health Insurance Company Executives and MARTINEAU, regarding what the contract lobbyist referred to as the "Martineau Conversion Bill."

40. On or about June 24, 1999, the Senate voted upon an amended version of The Health Conversion Act, 99-S1005 substitute A (the Senate companion bill to MARTINEAU's House bill 99-H6561 Sub AA), which required Department of Business Regulation approval before the conversion of a non-profit health insurance company. On that same date, MARTINEAU requested unanimous consent for immediate consideration of 99-S1005 as amended. MARTINEAU then voted to pass the Bill.

41. During the 1999 legislative session the General Assembly created a special legislative study commission ("Study Commission") that would focus, in part, on the financially ailing Health Insurance Company. The Study Commission was formed by a Joint Resolution, 99-S0946 Substitute A. This resolution created a fourteen (14) member special legislative commission whose purpose was to investigate all aspects of healthcare and HMO liability in the State of Rhode Island. Seven members of the Study Commission were selected by MARTINEAU in his capacity as Majority Leader. MARTINEAU also served as a Chairman of the Study Commission.

42. On July 27, 1999, the Health Insurance Company Legislative Affairs Department published the "1999 Rhode Island General Assembly Report" which provided in part:

(a) "Overall, it was a successful year for [the Health Insurance Company] although it was by far the busiest year for us in recent memory. Over 300 health care bills were introduced in the 1999 session, many of which affected [the Health Insurance Company], but about 100 of which had a significant impact on our operations."

(b) "As many of you know, the Any Willing Pharmacy legislation was one of

the most controversial issues facing [the Health Insurance Company] this year. While seven such bills were introduced, a single committee meeting was taken up in the House Corporations Committee and Senate Corporations Committee to debate each chamber's respective bills. Both bills generated about 15 hours of debate. This does not even begin to include all the time that went into lobbying House and Senate officials, as well as answering their questions . . . . In the end though, we were successful in persuading both the House and the Senate Corporations Committees to defeat all any willing pharmacy bills."

(c) "The other major bill affecting [the Health Insurance Company], which passed, was the Health Plan Conversion Act. This act which also applies to other health plans doing business in Rhode Island, requires health care entities wishing to acquire a RI health plan to submit to a comprehensive review and approval process by the Department of Business Regulations. In addition, the Attorney General's Office has an investigatory role in the process relative to charitable trusts and conflicts of interest. The conversion bill originally introduced in the Senate and proposed in the House would have effectively precluded [the Health Insurance Company] from merging or being acquired by a for-profit entity as it imposed nearly impossible standards and timeframes which would have discouraged any potential partner or acquirer from undertaking the process. However, [the Health Insurance Company] was able to obtain substantial changes to the bill which makes the process workable."

(d) "We were also successful in defeating, or in amending to a study commission, several bills that would have a significant impact on operations."

43. During the 1999 legislative session, as House Majority Leader and without disclosing his financial relationship with the Health Insurance Company, MARTINEAU:

(a) had the power to affect all legislation considered in the House and, at a minimum, took official acts that favorably affected the outcome of at least some of the 300 healthcare bills that affected the Health Insurance Company and the 100 bills that had a significant impact on its operations;

(b) worked to defeat Freedom of Choice;

(c) helped to amend the Health Conversion Act; and

(d) chaired the Study Commission.

### b. The 2000 Legislative Session

44. On or about February 3, 2000, a Freedom of Choice Bill (00-H7432) was introduced in the House.

45. On or about March 21, 2000, the Health Insurance Company agreed to purchase 3 million paper pharmacy bags from The Upland Group for a total of $58,500.00.

46. On or about April 6, 2000, the Corporations Committee voted on 00-H7432 which was the only Freedom of Choice Bill filed in 2000. The bill was defeated by a vote of 12-2. MARTINEAU opposed Freedom of Choice and used his influence, power and authority as Majority Leader to help obtain that result by discouraging sponsorship of Freedom of Choice legislation and influencing the vote on 00-H7432.

47. On or about May 1, 2000, a Health Insurance Company Executive sent a letter to MARTINEAU, which read in part, "Enclosed, please find a list of those House bills which are of significant concern to [the Health Insurance Company]."

48. On or about June 3, 2000, MARTINEAU invoiced the Health Insurance Company, $19,500.00 on Upland Group stationary, for 1 million paper pharmacy bags. Neither

MARTINEAU's name nor signature appear on the invoice.

48. On or about July 19, 2000, the Health Insurance Company issued a Purchase Order to The Upland Group for 1 million paper pharmacy bags.

49. On or about July 25, 2000, the Health Insurance Company Legislative Affairs Department published a "Wrap Up"of the 2000 General Assembly Session which read in part, "Overall it was a successful year for [the Health Insurance Company]. While well over 200 health care bills were introduced, very few ended up passing. The development and discussion of a 100+ page [RIte Care] reform bill dominated the last few months of the session for lawmakers and a variety of health care interest groups, including RIte Aid lobbyists and staff. During the 2000 session, the departure of [another insurance company] from Rhode Island and the RIte Care budget shortfall loomed in the minds of many lawmakers. While House and Senate leadership urged a cautious and deliberate approach in reacting to these issues, that did not minimize the number of health care bills introduced which sought to expand either the regulation of [the Health Insurance Company and another company] on the benefits we provide. We were successful in lobbying against the passage of many of these bills. . . . While the above bills did not pass, several bills affecting the Health Insurance Company did pass, the most significant of which is the 'Health Reform Rhode Island 2000 Act.' . . . While the Health Reform Rhode Island 2000 Act is not exactly to our liking, neither is it to the exact liking of any other group. Indeed, it is a true compromise."

53. During the 2000 legislative session, as Majority Leader and without disclosing his financial relationship with the Health Insurance Company, MARTINEAU not only worked to defeat Freedom of Choice but also had the power to affect all legislation considered in the House

and, at a minimum, took official acts that favorably affected the outcome of at least some of the over 200 healthcare bills, including The RIte Aid reform bill, that were introduced. The "Health Reform 2000 Act" was the legislation that resulted from the Study Commission chaired by MARTINEAU. On the same day that the "Wrap Up" report was issued, the Health Insurance Company sent a check to The Upland Group for $19,500. That check was mailed to MARTINEAU's home address and was later deposited into The Upland Group bank account.

54. On or about November 6, 2000, MARTINEAU invoiced the Health Insurance Company $19,500, on Upland Group stationary, for 1 million paper pharmacy bags. Neither MARTINEAU's name nor signature appear on the invoice.

55. On or about November 30, 2000, the Health Insurance Company issued a Purchase Order to The Upland Group for 1 million paper pharmacy bags.

56. On or about December 20, 2000, a Pharmacy contract lobbyist met with a Health Insurance Company Executive from the Legislative Affairs Department and MARTINEAU.

57. On or about December 27, 2000, just a week prior to the start of the 2001 legislative session, a Health Insurance Company check was issued to The Upland Group for $19,500.00. The check was mailed to MARTINEAU's home address and was later deposited into The Upland Group bank account.

**c. <u>The 2001 Legislative Session</u>**

58. On or about February 6, 2001, a Freedom of Choice Bill (01-H5495) was introduced in the House. The bill was referred to the Corporations Committee. This year there was no record that the bill was ever heard or that any vote was taken. MARTINEAU opposed Freedom of Choice and used his power, influence and authority as Majority Leader to help obtain

that result.

59. On or about April 16, 2001, MARTINEAU invoiced the Health Insurance Company $19,500.00 on Upland Group stationary for one million paper pharmacy bags. Neither MARTINEAU's name nor signature appear on the invoice.

60. On or about May 3, 2001, the Contracting AVP requisitioned for the purchase of 1 million paper pharmacy bags from The Upland Group totaling $19,500. The "justification" block on the form only contains the words "Upland Group."

61. On or about May 14, 2001, the Health Insurance Company issued a purchase order to The Upland Group for 1 million paper pharmacy bags.

62. On or about June 12, 2001, the Health Insurance Company issued a check to The Upland Group in the amount of $19,500.00. That check was mailed to MARTINEAU's home address and was later deposited in The Upland Group bank account.

62. On or about July 23, 2001, the Health Insurance Company Legislative Affairs Department published a "Rhode Island General Assembly Report" which states in part, "The 2001 General Assembly Session ended at 1:55 a.m. on Friday, June 29. Approximately 200 health care bills were introduced this year. Overall, it was a very successful session for [the Health Insurance Company], although it was one of the most contentious years in recent memory. We worked very hard to get several of our own bills passed as well as to defeat or reach compromises on other major pieces of legislation. As we mentioned in our 'wrap-up' memo last year, given our improving financial condition, we expected that there would be a number of groups, including hospitals, physicians, mental health advocates, etc., looking to get their 'fair share' of our reserve dollars and that definitely proved to be case this year."

63. During the 2001 legislative session, as Majority Leader and without disclosing his financial relationship with the Health Insurance Company, MARTINEAU not only worked to defeat Freedom of Choice but also had the power to affect all legislation considered in the House and, at a minimum, took official acts that favorably affected the outcome of at least some of the 200 healthcare bills in which the Health Insurance Company had an interest.

64. On or about September 24, 2001, MARTINEAU proposed a renewal of the independent pharmacy paper bag promotion on Upland Group stationary. Neither MARTINEAU's name nor signature appear in the document.

65. On or about October 12, 2001, MARTINEAU wrote a letter to the Contracting AVP on Upland Group stationary. Rather than sign his own name to the letter, Martineau attempted to conceal his identity and interest in the matter by signing the name of another person, whose identity is known to the United States of America, but who had no ownership interest in or employment with The Upland Group.

66. On or about December 6, 2001, the Health Insurance Company issued a purchase order to The Upland Group for 3 million paper pharmacy bags totaling $58,500.00.

67. On or about November 27, 2001, the Health Insurance Company approved a requisition for the purchase of 3 million bags from The Upland Group for $58,500.00.

68. On or about December 21, 2001, just before the start of the 2002 legislation session, the Health Insurance Company issued a check to The Upland Group for $58,500.00. The check was mailed to MARTINEAU's home address and was later deposited into The Upland Group bank account.

### d. The 2002 Legislative Session

69. On or about January 1, 2002, the Health Insurance Company Legislative Affairs Department issued a report entitled "2002 Pro-active Legislative Proposals." Among the pro-active legislative proposals, the report listed "The Health Insurance Company Enabling Act" which would allow the Health Insurance Company to offer other types of insurance for sale. The report also focused on "Health Insurance Reform Statutes" including restrictions on the extent of "rate bands" for pricing insurance policies. The Health Insurance Company wanted to delay the implementation of rate band restrictions for financial reasons.

70. On or about January 22, 2002, a Freedom of Choice Bill (02-H6872) was introduced in the House. The bill was referred to the Corporations Committee. No further action was taken, a result supported by MARTINEAU who, in 2002, continued to oppose Freedom of Choice and to use his power, influence and authority as Majority Leader to help defeat the legislation.

71. On or about April 4, 2002, MARTINEAU sponsored House Bill (2002-H8001), An Act Relating to the Small Employer Health Insurance Availability Act. That act extended the time within which a small employer insurance carrier could vary the adjusted community rates for health status from October 1, 2002 to October 1, 2004.

72. On or about July 22, 2002, the Health Insurance Company Legislative Affairs Department sent a memorandum to the Board of Directors, containing a summary of the 2002 Legislative Session which read in part, "While all the legislation we sponsored did not pass, we did have successes. Our number one priority legislation was passed into law; specifically, delaying the small group employee compaction of rate bands. . . . Disappointing, however, was

the defeat on the House floor of an expansion of the company's authority to sell other lines of insurance under its enabling legislation, despite the Speaker of the House and his leadership team supporting the bill."

73. During the 2002 legislative session, as Majority Leader and without disclosing his financial relationship with the Health Insurance Company, MARTINEAU not only worked to defeat Freedom of Choice but also had the power to affect all legislation considered in the House and, at a minimum, took official acts that favorably affected the outcome of at least some of the many bills that affected the Health Insurance Company. MARTINEAU also sponsored legislation (2002 H-8001) that delayed the implementation of rate band restrictions and was one of the "leadership team" that had unsuccessfully championed the enabling legislation for the Health Insurance Company.

74. On or about October 8, 2002, MARTINEAU proposed a renewal of the paper pharmacy bag promotion, on Upland Group stationary, in the amount of $58,500 for another 3 million bags plus $30,000 for inserts totaling $88,500. Neither MARTINEAU's name nor signature appear on the proposal.

75. On or about October 8, 2002, MARTINEAU sent another letter to the Contracting AVP from The Upland Group which read, "The following is the pricing you requested regarding our insert program. As we discussed, [the Health Insurance Company] would be responsible for providing the printed material and The Upland Group would insert it into the bags before shipment to the pharmacies. This program offers an excellent opportunity for [the Health Insurance Company] to launch or promote a new initiative or simply gain brand awareness for a current product or service." MARTINEAU again signed the same false name as in the last letter

to conceal his identity and his interest in the matter. The conversations referenced in the letter did not occur between the Contracting AVP and the person whose name falsely appears as the signatory on the letter. The conversations actually occurred between the Contracting AVP and MARTINEAU. MARTINEAU had explained to the Contracting AVP that he needed to keep his involvement "low profile."

76. On or about November 18, 2002, MARTINEAU Invoiced the Health Insurance Company, $58,500.00 on Upland Group stationary, for 3 million paper pharmacy bags with the shipment date to be determined. Neither MARTINEAU's name nor signature appear on the invoice.

### 3. Martineau Leaves Public Office and The Bag Contract Ends

77. At no time between when he first solicited business from the Health Insurance Company in 1998, until he left office in 2002, did MARTINEAU ever disclose his conflict of interest to the citizens of the State of Rhode Island, including to the Ethics Commission.

78. On or about February 3, 2003, the Health Insurance Company issued a check to The Upland Group for $58,500.00. The check was mailed to MARTINEAU's home address and was later deposited into The Upland Group bank account. This was the last check issued to The Upland Group by the Health Insurance Company.

79. Between on or about May 27, 2003, and September 16, 2003, MARTINEAU invoiced the Health Insurance Company and sent various communications to Health Insurance Company Executives in an attempt to collect an additional $19,500.00 that he claimed was owed to him. Those efforts failed and the Health Insurance Company never paid MARTINEAU's final invoice.

80. Of the ten million bags that MARTINEAU invoiced to the Health Insurance Company for a total of $195,000.00, less than approximately two million bags were ever manufactured.

**E. Use of the Mails**

81. Throughout the course of this scheme, many proposals, letters, invoices and checks were delivered through the mail for the purpose of executing the scheme to defraud.

82. On or about February 3, 2003, in the District of Rhode Island, for the purpose of executing the scheme and artifice to defraud described in paragraphs 1 through 80, MARTINEAU did knowingly cause a check from the Health Insurance Company dated February 3, 2003, in the amount of $58,500.00 payable to The Upland Group and addressed to 77 Upland Avenue, Woonsocket, Rhode Island to be placed in an authorized depository for mail matter to be sent and delivered to him by the United States Postal Service.

All in violation of 18 U.S.C. § 1341 and 1346.

## COUNT II

## The Pharmacy Scheme

**(Honest Services Mail Fraud - 18 U.S.C. §§ 1341 and 1346)**

83. The allegations contained in paragraphs 1-16 are incorporated by reference.

**A. The Scheme to Defraud**

84. From a time unknown but from at least on or about March 1, 1999, through at least on or about December 31, 2002, in the District of Rhode Island and elsewhere, MARTINEAU, knowingly devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to his honest services and to have

those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment, and used the United States mails in furtherance of that scheme and artifice to defraud.

**B. <u>Manner and Means</u>**

85. It was part of the scheme and artifice to defraud that MARTINEAU had undisclosed and improper conflicts of interest which deprived the State of Rhode Island and its citizens of their intangible right to his honest services, in that he obtained money from the Pharmacy that had a financial interest in legislation and matters pending before the Rhode Island General Assembly and the House of Representatives.

86. It was further part of the scheme and artifice to defraud that MARTINEAU was influenced and affected in his official actions as a State Representative and House Majority Leader, in a manner which benefitted the Pharmacy, including but not limited to, using his influence, power and authority to take official actions and to refrain from taking official actions all to benefit the Pharmacy as well as to influence other legislators to act or fail to act in such a way as to benefit the Pharmacy.

87. It was further part of the scheme and artifice to defraud that MARTINEAU intentionally deceived the State of Rhode Island and its citizens by, among other things, failing to disclose the conflicts of interests created by his financial relationship with the Pharmacy in order to continue to participate in the legislative process, using his power, influence, and authority, to favorably effect legislation of importance to the Pharmacy without public knowledge and scrutiny of his financial relationship with the Pharmacy.

## C. Execution of the Scheme

### 1. MARTINEAU's Business With the Pharmacy

88. From a time unknown but from at least in or about 1986, MARTINEAU had a long standing business relationship with the Pharmacy. When MARTINEAU was elected to public office in November of 1987, he was already deriving commission income from the sale of commodities to the Pharmacy though his employment as a salesman with an established company.

89. Although MARTINEAU was already deriving commission income from his business dealings with the Pharmacy, once he took office, he never disclosed that relationship or the conflicts it created when taking official action as a legislator.

90. After he became the House Majority Leader on June 25, 1998, MARTINEAU continued to take official action on legislation in which the Pharmacy had a financial interest without disclosing the conflicts of interest it created. However, beginning at least in or about March of 1999 he began doing business directly with the Pharmacy, not as a salesman for an established company, but as the sole owner and only employee of The Upland Group. From the time MARTINEAU became the Majority Leader until he left the House of Representatives in December of 2002, the Pharmacy had a financial interest in hundreds of pieces of proposed legislation that were being considered in the House, while at the same time MARTINEAU received approximately $716,435.24 in commission payments on contracts with the Pharmacy. MARTINEAU never disclosed the conflict of interest his business relationship with the Pharmacy created during this period of time.

## 2. Legislative and Financial Dealings Between MARTINEAU and the Pharmacy By Session

### a. The 1999 Legislative Session

91. In 1999 the debate on Freedom of Choice intensified and several new legislative proposals were introduced in the House and the Senate.

92. On or about January 12, 1999 and January 26, 1999, two Freedom of Choice Bills (99-H5061 and 99-H5269) were introduced in the House and were referred to the Corporations Committee.

93. On or about January 27, 1999, a contract lobbyist for the Pharmacy and a contract lobbyist for The Health Insurance Company conferred at the State house with "Majority Leader Martineau regarding Health Insurance Company Legislation."

94. On or about January 28, 1999, and February 2, 1999, third and fourth Freedom of Choice Bills were introduced in the House (99-H5400 and 99-H5868).

95. On or about March 1, 1999, a Pharmacy employee mailed MARTINEAU a letter informing him that The Pharmacy was examining its plastic bag contracts and invited him to submit a proposal for a plastic bag contract from the Pharmacy.

96. On or about March 1, 1999, MARTINEAU gave an interview to a reporter that resulted in a published article in which MARTINEAU publicly stated that he had changed his opinion on Freedom of Choice Legislation, indicating that he now believed that the new pharmacy contract had ample protection for both independent pharmacies and consumers against chain monopolies. MARTINEAU did not disclose that he was also now being paid by the Health Insurance Company and was negotiating with the Pharmacy for a new contract.

97. On or about April 1, 1999, the Corporations Committee held a hearing on House Freedom of Choice bills 99-H5868, 99-H5061, 99-H5269 and 99-H5400. Witnesses included representatives of the Pharmacy and the Health Insurance Company, who opposed Freedom of Choice, and representatives of companies that supported the legislation.

98. Six days later, on or about April 8, 1999, the Pharmacy sent MARTINEAU another request for a proposal. This time, the Pharmacy invited MARTINEAU to supply paper pharmacy bags. On the same day, and for the first time since Freedom of Choice legislation was proposed, the Corporations Committee voted 17-0 against Bills 99-H5868, 99-H5061, 99-H5269 and 99-H5400. This year, MARTINEAU opposed that legislation and used his power, influence, and authority as Majority Leader to influence the vote in the Corporations Committee to help obtain that result.

99. On or about May 13, 1999, The Pharmacy awarded a bag manufacturer in Canada, that MARTINEAU represented, a plastic bag contract. MARTINEAU derived income on this contract by having the Pharmacy send payments to the plastic bag manufacturer in Canada. The plastic bag manufacturer, in turn sent commission payments to a sales representative in New York who then mailed MARTINEAU's share of the commissions to The Upland Group at MARTINEAU's home address, which MARTINEAU later deposited into The Upland Group bank account.

100. On or about July 1, 1999, the Pharmacy awarded a manufacturer in New Jersey, that MARTINEAU represented, a paper bag contract. MARTINEAU derived income on this contract by having the Pharmacy send payments to the paper bag manufacturer in New Jersey. The paper bag manufacturer then mailed commission payments to The Upland Group at

MARTINEAU's home address, which MARTINEAU later deposited into The Upland Group bank account.

101. After the 1999 legislative session, MARTINEAU continued to receive payments in the form of commissions from his sale of both plastic and paper bags to the Pharmacy, intending to oppose Freedom of Choice legislation and to perform other acts to benefit the Pharmacy all without disclosing the conflicts of interest that his financial relationship with the Pharmacy created.

**b. <u>The 2000 Legislative Session</u>**

102. On or about April 6, 2000, the Corporations Committee voted on 00-H7432 which was the only Freedom of Choice Bill filed in 2000. The Bill did not pass. MARTINEAU was opposed to Freedom of Choice and used his influence, power and authority as Majority Leader to discourage sponsorship of Freedom of Choice legislation as well as to influence the vote of other legislators on 00-H7432.

103. During the 2000 legislative session the Pharmacy had an interest in numerous pieces of legislation being considered in the House. Examples of such legislation include: an act relating to pharmacies (00-H8279); prescription drug fair pricing legislation (00-H8086, and 00-H8086); an act relating to zoning ordinances to permit pharmacy drive-thru tellers (00-H7448); an act relating to mail order pharmaceuticals (00-H6928); various acts relating to drug coverage (00-H7478, 00-H7574 and 00-H7673); acts relating to pharmaceutical assistance to the elderly (00-H7093, 00-H7480 and 00-H6834); as well as pharmacy Sunday and holiday sales (00-H6760).

104. During the 2000 legislative session, as Majority Leader and without disclosing his financial relationship with the Pharmacy, MARTINEAU not only worked to defeat Freedom of Choice, but also had the power to affect all legislation considered in the House and, at a minimum, took official acts that favorably affected the outcome of at least some of the many pieces of legislation in which the Pharmacy had an interest.

**c. <u>The 2001 Legislative Session</u>**

105. On or about February 6, 2001, a Freedom of Choice Bill (01-H5495) was introduced in the House. The bill was referred to the Corporations Committee. This year there was no record that the bill was ever heard or that any vote was taken. MARTINEAU opposed Freedom of Choice and used his power, influence and authority as Majority Leader to help obtain that result.

106. During the 2001 legislative session, the Pharmacy had an interest in numerous pieces of legislation being considered in the House. Examples of such legislation include: an act relating to prescription medications for the elderly (01-H5748); the prescription drug reduction act of 2001 (01-H5909); an act relating to the repeal of pharmacy laws (01-H5299); acts related to unfair sales practices (01-H5158 and 01-H5173); and an act establishing eligible drugs under RIPae (01-H5988).

107. During the 2001 legislative session, as Majority Leader and without disclosing his financial relationship with the Pharmacy, MARTINEAU not only worked to defeat Freedom of Choice but also had the power to affect all legislation considered in the House and, at a minimum, took official acts that favorably affected the outcome of at least some of the legislation in which the Pharmacy had an interest.

**d. 2002 Legislative Session**

108. On or about January 22, 2002, a Freedom of Choice Bill (02-H6872) was introduced in the House. The bill was referred to the Corporations Committee. No further action was taken, a result supported by MARTINEAU who continued to oppose Freedom of Choice and to use his power, influence and authority as Majority Leader to help defeat the legislation.

109. During the 2002 legislative session, the Pharmacy had an interest in numerous pieces of legislation being considered in the House. Examples of such legislation include: an act relating to mail order pharmaceuticals (02-H6772), an act relating to fair market drug pricing (02-H6763), acts relating to minimum wages and unit pricing (02-H6883 and 02-H7289), and Canadian pharmacies legislation (02-S3018).

110. During the 2002 legislative session, as House Majority Leader and without disclosing his financial relationship with the Pharmacy, MARTINEAU not only worked to defeat Freedom of Choice but also had the power to affect all legislation considered in the House and, at a minimum, took official acts that favorably affected the outcome of at least some of the legislation in which the Pharmacy had an interest.

**3. Summary of Payments to Martineau**

111. On various dates after March 1, 1999, MARTINEAU received commission payments on the plastic bag and paper bag contracts.

112. In all, between March 1, 1999 and on December 31, 2002, MARTINEAU received a total of approximately $716,435.24 in commission payments on the plastic and paper bag contracts with the Pharmacy.

**E. Use of Mails**

113. Throughout the course of this scheme, many proposals, letters, invoices and checks were delivered through the mail for the purpose of executing the scheme to defraud.

114. On or about December 23, 2002, in the District of Rhode Island, for the purpose of executing the scheme and artifice to defraud described in paragraphs 83 through 112, MARTINEAU did knowingly cause a commission check dated December 23, 2002, in the amount of $15,803.00 payable to The Upland Group to be placed in an authorized depository for mail matter to be sent to 77 Upland Avenue, Woonsocket, Rhode Island and delivered to him by the United States Postal Service.

All in violation of 18 U.S.C. § 1341 and 1346.

ROBERT CLARK CORRENTE
UNITED STATES ATTORNEY

STEPHEN G. DAMBRUCH
Criminal Chief

GERARD B. SULLIVAN
Assistant U.S. Attorney

DANIEL A. PETALAS
Trial Attorney
PETER J. AINSWORTH
Deputy Chief
Public Integrity Section
Criminal Division
United States Department of Justice
1400 New York Avenue, N.W.,
Suite 12100
Washington, D.C. 20005
(202) 514-1412