UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. CR 07-129ML |
| | : | |
| GERARD M. MARTINEAU | : | |

## PRESENTENCING MEMORANDUM

## I. PERSONAL BACKGROUND

The U.S. Probation Department has adequately described Mr. Martineau's background in the Pre-sentence Report. However, the following additional facts are presented for the Court's consideration.

Gerard Martineau grew up in the City of Woonsocket, the sixth of Paul and Rachel Martineau's eight children. Hard work was instilled in Mr. Martineau from a very young age. While attending Holy Family School in Woonsocket, he maintained a daily paper route to assist in meeting the large family's expenses. This was a time-consuming endeavor, requiring Martineau to rise at 5:30 a.m. every weekday to deliver the Providence Journal, the Record American, and the Boston Herald on a route of approximately 80 households. After school, he would deliver the Woonsocket Call to the same customers. On Sundays, he maintained a smaller route of approximately 50 homes and after completing his deliveries he would sell extra papers in front of Holy Family Church after the 8:30 a.m. mass.

Mr. Martineau attended Mt. Saint Charles Academy and graduated in 1976. He played hockey until a broken knee ended his athletic career. Martineau did well academically and was accepted at St. Anselm College in Manchester, New Hampshire. Unfortunately, during Mr. Martineau's first month at St. Anselm, his father died following cancer surgery. He offered to stay

home for a year to help out with the family, but his mother would not hear of it and told him that his father would have wanted him to continue with his studies. Nevertheless, during that first year, Mr. Martineau returned home to Woonsocket frequently, either by hitchhiking or getting rides from fellow students. During the summers, he worked at myriad jobs to earn tuition money, including a job as a floor boy at Reliant Plastics in Woonsocket (a manufacturer of children's products); loading ice cream in a freezer for Peter Pan Ice Cream; and working as a landscaper in Cumberland.

Following graduation from St. Anselm in 1980, Mr. Martineau interviewed for several sales positions and took a job with P&B Office Machines, a Warwick office products dealer. His starting salary was $10,000 plus a base commission and a modest reimbursement for gas. During his time at P&B, Martineau sold Adler typewriters and copiers, but found competing in the marketplace with the likes of IBM was a difficult challenge.

## II. 1982: MR. MARTINEAU JOINS SET POINT PAPER COMPANY

In 1982, Mr. Martineau explored an opportunity with Set Point Paper Company located in Foxboro, Massachusetts. Set Point was a well respected regional commercial packaging distributor. Martineau saw an excellent opportunity with an employer who seemed genuinely interested in its employees. He first met with the owner, Mr. Richard Madigan, his daughter Ann Marie, his son Richard and his son-in-law, Mike Keneally, at the family run business. He felt it was a company he could grow with and he embarked upon a 15 year career with Set Point. Martineau became very close with the Madigan family and developed more than just an employer/employee relationship with them. They treated him like a son.

In 1984, Gerard Martineau married Lisa-Marie Rotatori of Woonsocket. The Madigan family attended the wedding. As Set Point grew, so did Martineau's family. Seth (a sophomore at Emory

University) was born in 1988 and Max (an 8th grader at Moses Brown School) was born in 1994. Mr. Martineau was the main breadwinner for the family as Lisa-Marie suspended her career as an R.N. to stay at home and raise the two boys.

Set Point's product lines were broken into three major groups: a retail packaging section, consisting of paper and plastic bags, boxes, tape and cushioning materials; an industrial packaging section, which included, Kraft papers, industrial tape, adhesives and corrugated cartons; and an office products section, consisting of copy paper, computer paper, toners and printer supplies. Initially, a new sales person at Set Point was encouraged to learn all three product groups and Martineau received significant guidance from the Madigans and other employees.

After his first couple of years at Set Point, Martineau felt that he knew the product line well, and believed that his best potential as a salesman was in the area of retail packaging and office products. Since he was from northern Rhode Island, Martineau was encouraged to seek sales prospects in the Rhode Island and the southeastern Massachusetts area. He began to solicit business from local Rhode Island companies such as CVS, Textron, Hasbro, Fleet, Grinnell and Stanley Bostitch. Over the years, he was able to develop business with all of these Rhode Island companies through persistent networking and cold calls which he accomplished by establishing solid relationships with the procurement people in these various companies.

By 1986, the fastest growing segment of Set Point's business was retail packaging. The sales force had landed substantial packaging customers such as Filene's, Jordan Marsh, Marshalls, Talbots, LL Bean and JC Penney and Mr. Martineau began to focus his efforts on the retail side of the business. He also began to expand his customer base outside of the Rhode Island and the southeastern Massachusetts area as the number of local retailers was limited.

By 1990, Mr. Martineau was spending a majority of his time developing retail prospects primarily in the health care, office products and retail areas focusing on companies like Maxi Drug of Springfield, Massachusetts; Rite-Aid of Camphill, Pennsylvania; Fay Drug of Pittsburgh; Albertson of Boise, Idaho; Health America of Pennsylvania; ConnectiCare of Connecticut; Schering Plough of New Jersey; and Dunkin Donuts and Staples, based in Massachusetts. Martineau also continued to successfully market and sell his product line to CVS, Textron and Hasbro. Over years of hard effort and sheer hustle, Mr. Martineau had made himself a capable salesman of office related products and packaging. His employment and development as a salesperson date back to his graduation from St. Anselm College in 1980 and clearly pre-existed his election to the Rhode Island General Assembly in 1987.

**1983: BUSINESS RELATIONSHIP WITH CVS IS ESTABLISHED**

Mr. Martineau first obtained CVS business in 1982 by cold calling CVS procurement people as an employee of Set Point. Martineau felt CVS was a natural sales prospect for him since he was a Woonsocket native and CVS was a fast growing pharmacy company which had been founded in that city. Martineau began calling CVS buyers in 1982 to try to introduce products from Set Point. His first success with CVS occurred in 1983 when the company agreed to order copy paper, office supply items, strapping and prescription tape. By 1990, Martineau was also able to develop plastic bag sales business with CVS. Throughout this vendor/vendee relationship, Set Point was only one of several companies that supplied plastic bags to CVS. A company of CVS's size would rarely agree to a sole source contract.

By 2000, Martineau was also able to develop paper pharmacy bag orders from CVS buyers. Both paper and plastic bags are still being purchased by CVS from the various manufacturers that Mr.

Martineau had represented before his present indictment and guilty plea. Over the years, as CVS acquired other pharmacy chains throughout the country, Set Point's paper and plastic bag volume business grew as well. When Set Point first began supplying product to CVS, the company, had 1,400 locations. It currently has more than 6,000 locations. Martineau's business relationship with CVS was developed at the level of the procurement buyers. The purchase decisions made by these buyers, Martineau believes, were based on cost, quality and service.

As Set Point grew its retail business, it was able to acquire additional product lines and offer a broader range of bags to CVS and other customers of similar size. Set Point consistently worked to develop better lines and had very knowledgeable sales people. Martineau believed that commitment to service was the primary reason Set Point's sales force was more successful than many of its competitors. There was never any shortage of vendors competing for CVS's business, but CVS's procurement people were well aware of the good suppliers. Price, quality and delivery service were always the key components in any dealings with CVS.

Over the years, Martineau was involved in dozens of meetings with CVS procurement staff. He sent numerous e-mails and written proposals to them and was very involved in all aspects of marketing Set Point's packaging business. Since Set Point first gained a share of CVS's business in 1982, Martineau was Set Pont's only contact salesperson with CVS. Like most companies of its size, however, CVS maintained multiple vendors for large volume items, such as plastic and paper bags. This assured competitive pricing and service and protected against unexpected events such as a labor strike or fire damage at manufacturers' plants. One of Martineau's main competitors for CVS's plastic bag business was a family-managed independent manufacturer's representative based in West Warwick.

In summary, Mr. Martineau's business relationship with CVS began in1982 – more than four years before he was elected to the General Assembly. He developed this business at Set Point through old-fashioned cold calling and networking, and not through any political connections. Over the years, Martineau developed a substantial business relationship with CVS which, he readily admits, should have been disclosed through the filing of Rule 6 notices when he was an elected representative in the General Assembly and was in a position to vote on, or influence, legislation that did, or could have, had an impact on CVS. However, it is clear that Martineau's business relationship with CVS significantly predated his election to the General Assembly. It was established by his persistent sales skills and the development of relationships with the CVS buyers whose own performance was graded on obtaining the best product for the best price and follow-up service.

## IV. 1996: MARTINEAU LEAVES SET POINT AND BEGINS THE UPLAND GROUP

In 1996, the sales force at Set Point was advised by the Madigan family that they had decided to accept a significant offer to sell its distribution business to Unisource, a $9 billion company which had acquired many other regional companies like Set Point. The terms of the sale to Unisource provided that the Madigan family would continue in a consultant/management relationship. While the Madigans thought that things generally would remain the same, they could not guarantee that changes would not occur since Unisource had the final say on significant business decisions.

At that point, Martineau had been at Set Point for 15 years. His own customer base had developed and was becoming less dependent on fixed distribution networks, like Set Point, and more reliant on direct shipments from plastic and paper bag manufacturers to the consumer. After much thought and discussion with his family, Martineau approached the Madigan family and told them that he was considering starting his own business as an independent manufacturer's representative. While

Martineau felt great regret about leaving the Madigans, the fact that they had sold the business made the decision somewhat easier. From the time he first spoke with the Madigans, they indicated that they understood his reasoning and supported his decision. As a manufacturer's representative, Martineau continued, for a time, to work with Set Point and a very amicable resolution was ultimately reached between the parties. To this day, Mr. Martineau has maintained a close personal relationship with the Madigans.

In February of 1997, Martineau left Set Point and started a sole proprietorship which he designated as "The Upland Group," simply named for the street that Mr. Martineau and his family lived on and where he maintained his office.

Martineau's formation of the Upland Group was purely a business decision and was not related to any enhanced political position he had achieved in the Rhode Island General Assembly. Quite simply, there was nothing nefarious about his formation of this business. The industry in which Martineau worked was generally populated by independent contractors who were known as "manufacturers' representatives." For many years, Martineau's chief competitor for the plastic bag business at CVS and Rite Aid was a local independent manufacturers' representative based in Rhode Island.

The use of independent manufacturers' representatives in this particular industry is common and makes business sense. By utilizing independent manufacturers' representatives, large manufacturers of paper and plastic bags do not have to hire a sales force for which they would be required to pay health insurance, workers' compensation insurance, and other employee benefits. Manufacturers' representatives normally establish themselves in various sales regions and better understand the local markets. Companies such as CVS, Hasbro and Jordan Marsh often deal with manufacturers' representatives when purchasing large amounts of commodities, such as paper and

plastic bags, strapping tape and similar products. The companies that buy these products are only interested in a good product that is timely delivered with consistent follow up service. Because independent manufacturer representative's commissions are based on these factors, their motivation to service their customers is paramount. By utilizing brokers, the manufacturer has no obligation to pay sales people unless they produce, and they are only responsible for paying commissions for what is actually sold. Additionally, both manufacturers and customers typically rely upon manufacturers' representatives for their expertise and their ability to develop relationships with the customers and suppliers in certain industries and in certain regions.

It also made sense for Mr. Martineau, at this point in his career, to strike out on his own because manufacturers would pay direct commissions to him without any percentage of the commission going to the distributorship.

For these reasons, in 1996, Martineau set up an office in his home. He communicated with his customers and manufacturers through e-mail and by telephone and would also make personal calls on various customers to ensure that the product was being timely delivered and that his customers were satisfied. On occasion, he would travel to the manufacturers' locations, some of which were in Canada or in various other states. Shifting to a self-employed status also allowed Mr. Martineau more flexibility with his own schedule as his sons' activities demanded more of his time.

As it turned out, Martineau's acceptance of this business risk turned out well as he was able to earn more through direct commissions. Through the Upland Group, he continued to market plastic bags and paper bag products to CVS, Maxi Drug, Rite Aid, Fay Drug and Health America of Pennsylvania, but now as an independent manufacturer's representative.

## V. 1987-2002: MARTINEAU'S ELECTION AND SERVICE IN THE GENERAL ASSEMBLY

The Martineau family was fairly well known in the City of Woonsocket. Mr. Martineau's father had been very active in the community and some of Martineau's siblings were also active in local politics. A brother served for several years on the Woonsocket City Council. It was not unusual, then, for Martineau to seek election to a seat in the House of Representatives from Woonsocket. He was motivated to run for office by his love of politics and his desire to give back to his community. Martineau was elected in 1986 at age 27, as an unendorsed Democratic candidate. He was first assigned to a seat on the House corporations' committee when he entered the House of Representatives in January of 1987. From 1987 to 1993, Martineau developed a reputation as a studious and forthright legislator with an ability to bring people together on issues.

In 1992, the sitting Speaker retired from politics and a two person battle ensued for the speakership. Martineau was aligned with the winning team in a very close election. As part of the winning team, Mr. Martineau was elected as Chairman of the corporations' committee in 1992 by his colleagues. Most of the bills referred to the House corporations' committee involve business and insurance matters as well as legislation affecting cities and towns. Generally, the committee consists of 15 legislators, with a chairperson and a vice chairperson, who are elected by the committee members. Candidates for the chair and vice-chair almost always have the backing of the House leadership team. During most of Mr. Martineau's tenure as chair of the corporations committee, Representative Brian Kennedy served as the Vice Chair.

Toward the end of the 1998 session, Martineau was elected to the position of house majority leader when the then majority leader, George Caruolo, retired from politics. The house majority leader is elected by the members of the majority party in a separate party caucus. The office of the majority leader provides support for all caucuses and conferences of the majority party and assists in

establishing the calendars for the House. Among a number of other duties, the majority leader's office is also responsible for tracking bills in committees, and on the floor of the House, and also provides legal research services for members of the majority party. Martineau served as the house majority Leader from the opening of the 1999 session through to his retirement as a legislator in 2002. In total, Gerard Martineau served 16 years in the Rhode Island General Assembly. He left political office because he felt that the demands of participating in his sons' activities, the development of his business, and looming school tuitions could not be balanced with the full-time duties expected of a majority leader in a part-time legislature.

## VI. 1999: MARTINEAU'S BUSINESS DEALINGS WITH BLUE CROSS/BLUE SHIELD

Over the years, Mr. Martineau had developed business sales relationships with health industry benefit managers such as Health America of Pennsylvania and ConnectiCare in Connecticut. These non-profit companies were essentially the equivalent of Rhode Island's Blue Cross/Blue Shield. Martineau had marketed and obtained paper bags orders from both Health America and ConnectiCare at approximately the same time he approached Blue Cross in 1999. While Mr. Martineau does not have a specific recollection of asking Blue Cross lobbyist Scott Frasier for the introduction to Blue Cross's marketing department, he has no reason to doubt Mr. Fraser's recollection that he asked him who he could speak to about marketing products to Blue Cross. Martineau certainly recalls that he did call upon the Blue Cross marketing and communications director, Mike Sisti. When Martineau met with Sisti, he presented a proposal to provide paper bags with the Blue Cross logo to retail pharmacy chains and independent pharmacies as a way for Blue Cross to advertise at the point of purchase. During his meeting with Sisti, Martineau displayed samples of other bags which he had marketed to Health America and ConnectiCare through the Upland Group (Attached are samples of those bags,

**Appendix A**). Sisti seemed to like the concept and acknowledged that he had seen the program implemented in other states over the years. Sisti then asked Martineau to contact CVS, Brooks, and the 40, or so independent pharmacies in Rhode Island to see if they would be interested in participating with Blue Cross in this promotion. CVS and Brooks declined the proposal since they preferred to promote themselves with their own bags. The independent pharmacies, however, were enthusiastic and agreed to participate.

The original proposal that Martineau provided to Blue Cross called for approximately 3 million bags. This projection was based on the participation of CVS, Brooks and all the independent pharmacies in the promotion. When CVS and Brooks declined, the need for the original projected volume was actually dramatically reduced. Nevertheless, Martineau agreed to furnish bags with the Blue Cross/Blue Shield logo and made arrangements for periodic shipments to all of the independent pharmacies. The bags were to be priced at $19,500 per million, which was the same price Martineau charged Health America of Pennsylvania and ConnectiCare.

Martineau's original intention was to have one of his manufacturers produce the bags, as agreed, and then bill for what was shipped. However, this transaction was unique in that Martineau had to personally arrange for the distribution of the bags to the independent pharmacies. He made several deliveries to the independents who, by and large, indicated that they liked the program and would continue to participate as long as Blue Cross was providing the bags at no cost.

Mr. Sisti asked Martineau to forward him written testimonials from some of the independent pharmacies and Martineau submitted written responses from a handful of those pharmacies to Sisti between 1998 and 2002. While Martineau arranged for periodic shipments of bags to the stores, it became clear that the quantities that he had been authorized to produce would not be required by the smaller independents as most of those pharmacies did not have the space to store a large inventory of

bags. Average deliveries to the independent pharmacies over this period were approximately 10 to 20 cases per store, depending on each store's available storage space.

Mr. Martineau wants this Court to know that he did not bring to Mr. Sisti's attention that the required volume from the independents was substantially less than anticipated, due to CVS and Brooks declining to participate. However, he continued to invoice Blue Cross at the higher volume level. Mr. Martineau is extremely ashamed of this conduct and admits it was dishonest. While he has not been charged by the government for this specific conduct, Mr. Martineau believes that he must be forthright and provide the Court with a full explanation of what actually occurred in this case.

At no time before the end of the contract did Mr. Martineau receive any inquiry from Blue Cross regarding the number of bags which were being delivered to the independents. After receiving several favorable reports from the independent pharmacies that had received the bags, Mr. Sisti was satisfied that the program was working and no accounting system was ever implemented by Blue Cross. While Mr. Martineau's days were extremely busy during this time, with his business and the duties required of an effective Majority Leader, he candidly admits that he has no legitimate excuse for this conduct.

The distribution contract with Blue Cross continued until sometime in 2003, when a Blue Cross representative inquired about the quantity of bags shipped and the contract was terminated.

## VII. THE HONEST SERVICES MAIL FRAUD STATUTE

18 USC §1346 generally provides that for purposes of the Federal Mail and Wire Fraud statutes (18 USC §§1341 and 1343, respectively), a "scheme or artifice to defraud" includes a "scheme or artifice to deprive another of the intangible right to honest services." 18 USC §1346 was enacted in 1988, for purposes of reversing the Supreme Court's decision in *McNally v. U.S.*, 483 U.S.

350 (1987). The majority of cases that have analyzed the honest services fraud doctrine have involved, the bribery of public officials where the charge under §1346 is brought in addition to other charges. However, there have been significant prosecutions under §1346 against public officials for conflicts that do not involve outright bribery or a "quid pro quo" transaction. The courts have recognized that the term "honest services," as used in §1346, is extremely broad, but the statute has survived challenges which have asserted that it is unconstitutionally vague. The courts have concluded that trial courts will apply a "common sense" usage of the phrase "honest services." See *U.S. v. Le Brook*, 837 F.Supp. 162, 171 (S.D.W. Va. 1993), aff'd. 58 F.3d 961 (4th Cir. P 1995). However, some courts have refused to allow §1346 to be used as a "catch all" that subjects every unethical or illegal act by a public official to a federal mail and wire fraud prosecution. Recently, the First Circuit focused on this distinction in the case of *U.S. v. Urciuoli,* No. 07-1297 wherein the First Circuit noted that:

> The central problem is that the concept of 'honest service' is vague and undefined by the statute. So, as one moves beyond core misconduct covered by the statute (e.g. taking a bribe for a legislative vote) difficult questions arise in giving coherent content to the phrase through judicial glosses. Closely related concerns are assuring fair notice to those governed by the statute. See *Bouie v. City of Columbia*, 378 U.S. 347, 350 (1964), and cabining the statute – a serious crime with severe penalties – lest it embrace every kind of legal or ethical abuse remotely connected to the holding of a government position. *Sawyer I*, 85 F3d at 725 (statute 'does not encompass every instance of official misconduct that results in the official's personal gain.'); see also *United States v. McNeive*, 536 F.2d 1245, 1252 (8th Cir. 1976).

See also *U.S. v. Bloom,* 149 F.3d 649, 654-556 (7th Cir. 1998); *U.S. v. Welch*, 327 F.3d 1081, 1107 (10th Cir. 2003).

The First Circuit has also stated in *U.S. v. Czubinski*, 106 F.3d 1069, 1076 (1st Cir. 1997), that "honest services convictions of public officials typically involve serious corruption such as embezzlement of public funds, bribery of public officials or "*the failure of public decision makers to disclose conflicts of interest*" (emphasis applied). Id. The alleged wrongdoing must "prevent or call

into question the proper or impartial performance of the public servant's official duties." Id. Pursuant to the First Circuit decisions in *Czubinski, Urciuoli* and *U.S. v. Woodward*, 149 F.3d 46, 57 (1st Cir. 1998) a public official can deprive citizens of his/her honest services from the public in essentially two ways: (1) the official can be influenced, or otherwise improperly affected, in the performance of his duties, or (2) the official can fail to disclose a conflict of interest which can be construed as affecting the impartiality of his or her decision making on public issues.

Counsel respectfully asserts that it is in the latter category that Mr. Martineau's conduct in this case falls. There is no evidence that Mr. Martineau's business interests with either CVS or Blue Cross were conditioned upon his vote for or against, or for his steering, of any particular piece of legislation. This is not a "quid pro quo" case. In fact, the business relationship with CVS pre-existed Martineau's election to the House of Representatives by at least four years. As the First Circuit has pointed out in *Urciuoli*, these types of conflicts can be fraught with peril, especially in a part-time legislature such as exists in the State of Rhode Island. *U.S. v. Urciuoli*, supra (Noting that even the legitimate work that a R.I. State Senator performed, traded in part on the reputation, network and influence that comes from political office in a part-time legislature). Mr. Martineau's prohibited conduct, in this case, is more akin to the conduct described by the court in *U.S. v. Bissell*, 954 F.Supp. 841 (D.N.J. 1996), wherein a jury found that a county prosecutor's failure to disclose outside business interests that conflicted with his duties as a prosecutor not only violated state ethic's laws, but further violated §1346.

The *Woodward* and *Sawyer* cases are also instructive. See *U.S. v. Woodward*, 149 F.3d 46, 57 (1st Cir. 1998); *U.S. v. Sawyer*, 239 F.3d 31 (1st Cir. 2001). While the total income earned by Mr. Martineau through his business dealings with CVS and Blue Cross exceeded the value of the meals, golf trips, superbowls and other entertainment expenses in the case involving Massachusetts House Representative Francis Woodward, the significance of the relationship in *Woodward,* and the

influence he wielded on bills of interest to John Hancock Insurance Co., were greater than those in this particular case. Woodward had served as the Chairman of the Joint House-Senate Committee on Insurance in the General Assembly of the Commonwealth of Massachusetts. The evidence in that case indicated that Woodward had formed a close, personal relationship with John Hancock's in-house lobbyist, William Sawyer, to the extent that they went on numerous out of state trips together, played many rounds of golf, and, on occasion, Woodward had the full use of Mr. Sawyer's credit card. The Clerk for the House Senate-Insurance Committee testified that Woodward had an "open door policy" as applied to Sawyer and that any of the bills that Sawyer opposed never got through Woodward's committee. Ultimately, both Woodward and Sawyer were convicted of various counts of honest services mail fraud and Woodward was sentenced to six months and a $5,000 fine, and Sawyer received a sentence of probation and a fine.

In this case, the facts are somewhat different. First of all, Gerard Martineau was a member of a part time legislature. Most, if not all, members of the Rhode Island General Assembly have full-time occupations. Martineau's occupation as a salesman of paper and plastic products, a career he had followed since his graduation from college was clearly established well before he was elected to the House of Representatives.

In Rhode Island, all legislators, as well as other state and municipal officials, (both elected and appointed), are governed by the Rhode Island Code of Ethics embodied in R.I.G.L. §§36-14-4 through 36-14-7. (A copy attached as **Appendix B**). Pursuant to the Code, elected and appointed officials are required to file yearly financial statements (§36-14-16). Martineau did file financial disclosure forms for all of the pertinent years which are reflected in the charging document. Notably, the government does not allege that Martineau falsified or concealed his relationship with CVS or Blue Cross by way of the yearly financial statements he filed. This is most likely due to the specific questions contained

within the financial disclosure form (see sample copy of Ethics Commission Yearly Financial Statement form and questions 6, 10-15 attached as **Appendix C**). The questions asked by the Rhode Island Ethics Commission in that form do not require a legislator who might be self-employed (such as an attorney, insurance salesman, and other independent business owner) to disclose who his or her clients or customers are.

However, the vehicle by which General Assembly members are required to disclose potential conflicts of interest is embodied within R.I.G.L. §36-14-6. Under that particular section of the ethics statute, a legislator, (or any other government official), who will participate in a matter in which he or she may have a potential conflict of interest is required to disclose the conflict by filing a so-called "Rule 6 disclosure" form. (A copy of a standard Statement of Conflict of Interest is enclosed herein as **Appendix D**). This form allows a legislator, or other government official, to disclose a potential conflict of interest regarding a particular matter and either permit the official to recuse from participation or state the reasons why the legislator can impartially participate. In essence, the Rule 6 disclosure ties in with the definition of conflict of interest contained in R.I.G.L. §36-14-7 (copy enclosed as **Appendix E**). Under §36-14-7, a person subject to the Code would not have an interest "in substantial conflict with the proper discharge of his or her duties in the public interest" on a particular bill if any potential benefit or detriment that might inure to him or his family, or any business associate, would be no greater than the benefit to any other similarly situated member of the particular business, profession, occupation or group.

If Mr. Martineau had disclosed, in a Rule 6 filing, that he had potential conflicts of interest on health care or business related bills that could effect his larger customers (such as, CVS and Blue Cross), but still felt he could vote (because a proposed bill affected him, or his clients, to no greater extent than it effected any other similarly situated entities) then he would have properly notified the

public of potential conflicts. (However, he could, for the sake of argument, still have been subject to an ethics complaint if any citizen felt that he did have a conflict of interest and should not have voted.) On bills that clearly would have affected him or his customers more than others, Martineau could have disclosed the conflict in the Rule 6 disclosure form and recused himself.

Martineau realizes he also could have sought an opinion from the Rhode Island Ethics Commission concerning his ability to vote, generally, on health care measures indicating that he had corporate clients in the health care industry that were substantial customers. He is also fully aware that if he had filed Rule 6 disclosure notices and/or sought an advisory opinion, he most likely would not find himself in the situation he is in today.

However, counsel respectfully submits that there is no evidence which would indicate that the offense in this case involved evidence of a "quid pro quo" wherein Martineau's business interests with Blue Cross or CVS were tied to his specific action on any particular piece of legislation. (This will be discussed in further detail below.)

The Government does not allege that this is a quid pro quo case and, to the defendant's knowledge, it is the Government's position that the honest services statute is violated by participation in the legislative process when the conflict is concealed by an elected official from the public, whether the legislator's participation inures to the benefit of, or to the detriment of, the concealed party.

Having said that, Mr. Martineau readily admits that the ambit of §1346 demands the honest, faithful, disinterested service of public officials and applies whether the official is bribed to take favorable action or if he fails to disclose a conflict of interest before acting. See *U.S. v. Mangiardi*, 962 F.Supp. 49, 51 (M.D. Penn. 1997). Martineau also fully recognizes that he should have disclosed his potential conflicts of interests (perhaps even by filing a standing Rule 6 disclosure as related to these two customers) because, as a public official, he was acting as a trustee for the citizens of the

State and thereby owed the normal fiduciary duties of a trustee - honesty and loyalty to the public. Mr. Martineau admits that he did not fulfill that duty when he did not publicly disclose, his potential conflicts as a legislator as they related to CVS and Blue Cross.

## VIII. THE HONEST SERVICES DOCTRINE AS APPLIED TO THIS CASE

As the First Circuit has pointed out in *Urciuoli*, supra, the government can determine to proceed in an honest services prosecution on a theory that a violation of 18 U.S.C. §1346 occurred either by a concealed conflict of interest or by a quid pro quo bribery scheme. Martineau's actions violated the statute by a concealing a conflict of interest while participating in votes and actions on legislation that could have, or did, affect two of his significant customers, Blue Cross and CVS.

The information charging document in this case focuses on four specific years of Martineau's 16 years of legislative service – 1999, 2000, 2001, and 2002.

In 1999, a bill was introduced in the General Assembly that was commonly referred to by two acronyms: the "any willing provider" or "freedom of choice" bill. This bill was originally introduced in 1995 and was aimed at the network that Blue Cross had designed with CVS and Brooks Pharmacies ostensibly to negotiate better pricing for its subscribers. However, the smaller, independent pharmacies had complained that they were being squeezed out of the network by the bigger chain drug stores.

The first "any willing provider" legislation was actually introduced by the vice chairman of house corporations, Representative Brian P. Kennedy, D-Hopkinton in 1995. In a November 21, 2004 article, <u>Providence Journal</u> staff writer Mike Stanton referred to Kennedy's legislation as "a little noticed, three page bill requiring health insurers to cover prescriptions at any pharmacy in Rhode Island." (Stanton, <u>Providence Journal</u> article dated 11/21/04 attached as **<u>Appendix F</u>**). In the article,

Stanton noted that "Kennedy, in recent interviews, said he introduced the bill on behalf of a constituent who ran an independent pharmacy in Westerly. Independent pharmacies were concerned because Blue Cross, the State's largest health insurer, had created a network of CVS and Brooks Pharmacies and would only pay for prescriptions filled there." In an interview with Stanton, Representative Kennedy indicated that "Martineau told him that he had 'issues' with the legislation – that 'CVS is in my district, and they're a good corporate citizen' but that he would 'step back' and not hold up the bill in committee. Martineau never told him (Kennedy) that he sold bags to CVS, said Kennedy."

The State House records indicate that the corporations committee voted, 11 – to 3, to approve Kennedy's bill, with Martineau voting against it in the 1995 Committee vote. This was striking because Martineau was the chairman of the corporations committee at the time of the successful vote on this bill. The bill then went to the full House which approved it overwhelmingly on April 25, 1995. Martineau was not present and did not vote on the floor. The bill went to the Senate where it died in the senate corporations committee.

In 1996, the same legislation was introduced and once again, the house corporations committee approved it, after a hearing in which a CVS lobbyist testified against it. The bill passed in the House corporations committee and Martineau voted for the bill when the full House unanimously approved it. In other words, Martineau cast his vote against the interests of his two significant customers. Once again, however, the bill died in the Senate corporations committee.

The record further indicates that Martineau did not vote on the bill in 1997 or 1998, either in committee or on the House floor, although it went through the House successfully in both years and died, once again, in the Senate corporations committee.

According to Representative Kennedy's interview with Stanton, he believed the problem in the Senate was with the Senate corporations committee chairman, Senator William Irons, D-East Providence. Kennedy noted in the Stanton interview that "I'm surprised (that Martineau was selling bags to CVS), but at the same time, it would help explain why he didn't vote on the bill," said Kennedy. "If it was going to die, it was because of Billy Irons, not Gerry Martineau. It didn't matter what the House did. Irons was a major stumbling block." During this period, Martineau admits advising lobbyists, on both sides of the issue, that if access was not provided to the independent pharmacies, eventually, a statute would pass through the General Assembly, which would open up the market to more pharmacies.

At the end of the 1998 legislative session, Martineau was elevated to the position of Majority Leader and Representative Kennedy became chairman of the House corporations committee. Prior to the 1998 legislative session, Blue Cross had compromised with the independent pharmacies and opened up its network to 128 pharmacies, which included CVS and Brooks stores in Rhode Island, but now also included all of the state's 41 independent pharmacies. In the 1999 legislative session, (which is the first legislative session referred to in the Martineau information) the "any willing provider" legislation was reintroduced by several legislators. However, Representative Kennedy was not one of those sponsors and did not support the new bills. Kennedy explained that he did not support these bills because Blue Cross had agreed to expand its network to include the independent pharmacies, some of which were in Kennedy's district.

Driving the 1999 legislation were lobbyists for Walgreens and Stop & Shop, which were excluded from the new network. They were now pushing to have the Blue Cross network opened up to them. Both sides were debating whether Blue Cross's restricted network actually saved money for consumers or cost them more.

In April, 1999, Representative Kennedy held a hearing on several any willing provider bills before a packed audience in the State House room occupied by the House corporations committee. The committee voted unanimously to reject that legislation. In 2000, 2001 and 2002, various legislators introduced other forms of the "any willing provider" legislation. None of those bills had the support of Chairman Kennedy, or any group within the corporations committee, and therefore, none of the bills ever made it out of that Committee. Mr. Martineau did not participate, either on the floor or in any committee, on that legislation as it never came to the floor of the House for any action. In the Stanton interview, Representative Kennedy indicated that he, as chairman of corporations, would routinely send color-coded lists to the Speaker and Majority Leader of all the bills in his committee, recommending which ones should pass, in green, and which ones should die, in red. Kennedy indicated that he listed the pharmacy choice bills in red. Representative Kennedy indicated that the Speaker and the Majority Leader would return lists, but the pharmacy choice bills were not included. Kennedy also indicated that since his public position, from 1999 forward, was that the "any willing provider" legislation was not needed, he did not recall having any conversations with Martineau about the subject.

During 1999, Martineau had also sponsored a significant bill entitled the "Health Insurance Conversion Act" which increased the State's ability to regulate the sale of a nonprofit insurer to an out-of-state, for-profit company. This legislation was not favored by Blue Cross as it made a potential sale of Blue Cross to a for-profit entity more difficult.

During the 2000 legislative session, the House unanimously passed the Health Reform Rhode Island 2000 Act, which had been sponsored by Martineau. This was an 87 page bill which focused on myriad health care issues. Some of those issues concerned health care coverage for the poor and

insurance rates for small businesses. The Act was also designed to set aside monies significant enough to entice Blue Cross and United Healthcare to cover more of the State's uninsured poor.

During his participation in hearings in the joint committee studying health reform, Martineau did not disclose his contracts with CVS or Blue Cross. However, a number of participants in the Committee's work did not believe that Representative Martineau had any sort of agenda. Christine Ferguson, the former Rhode Island Human Services Director, worked with Martineau on health care reform on the Joint Committee during this time. She was also interviewed by Mike Stanton of the Providence Journal and told him, "My dealings with Gerry Martineau were always very good. I never had the sense that he had another agenda. He listened and learned and asked good questions. I always thought he did a good job trying to work through the issues – issues that were very controversial." When informed by Stanton of Martineau's business dealings with CVS and Blue Cross, Ferguson replied, "This raises a larger set of issues, in a state as small as Rhode Island, where there are so few players in health care, there's a higher responsibility and a small market to pay attention to what is or appears to be a conflict of interest and what isn't. My dilemma with Gerry is that he was upfront with a lot of stuff, and I didn't know about this." Ferguson added "I'm not surprised at Blue Cross. They were doing exactly what every incentive of the system allowed them to do. The question is how we create an environment where this is unacceptable." Senator (now Lieutenant Governor) Elizabeth Roberts, D-Cranston, also indicated, in an interview with Stanton, that she had worked with Martineau on the health care task force in 2000 and never saw him do anything that raised questions regarding his fairness or objectivity. She did note that "All of us in the legislature need to do more and look carefully at our business contracts and clients and how that connects with the work that we do."

Counsel has taken the liberty here of citing these quotations from a newspaper article because they were provided in a public forum, in 2004, and were not prompted by any discussion with any interested party to the present case.

Mr. Martineau is not in any way, shying away from his clear acceptance of responsibility for not disclosing conflicts of interest when he participated (whether for or against) legislation that could have affected two of his substantial customers. However, as this Court considers whether any mitigating circumstances exist, it is important to note that Gerard Martineau was not the driving force for or against the "any willing provider" legislation, and, in his general participation in health care reform legislation, witnesses indicate that he acted professionally and without any outward bias.

It is also worth noting that the main proponents for the more stringent legislation embodied in the Health Insurance Conversion Act were the Department of Attorney General and the Department of Business Regulation. Blue Cross was not happy with any proposed legislation imposing stricter regulations. However, the leadership in both the House and Senate ultimately passed the legislation with input from many individuals and entities.

In summary, Mr. Martineau did participate in legislation that could, or did, affect the interests of CVS and Blue Cross. However, counsel believes the government would agree that, in some instances, his positions or actions in the legislature supported the positions of Blue Cross and CVS on certain bills, and in other instances, did not support the positions of those entities.

Mr. Martineau readily admits to this court that he did have a vehicle available to him to publicly announce, and to review, potential conflicts of interest (an ethics advisory opinion) and a public vehicle to disclose any potential conflicts (the Rule 6 disclosure form) and he did not avail himself of either opportunity.

## IX. SPECIFIC OFFENSE CHARACTERISTICS AND THE APPLICATION OF UNITED STATES V. BOOKER AND 18 USC §3553(a)

Pursuant to §2C1.7(b)(1)(A)(ii) of the U.S. Sentencing Guidelines (USSG), in addition to the base offense level calculation, the Guidelines recommend to the Court that if the value of anything obtained, or to be obtained, by a public official or others acting with a public official, whichever is greater, exceeds $5,000, then the offense level is increased by applying the table contained within §2B1.1 of the USSG. In this case, the calculation is based upon the total value of commissions paid to the defendant from both CVS and Blue Cross, to wit, approximately $911,435.24. Count 1, which involves Blue Cross, set the value at approximately $175,000. Count 2, which involves CVS, calculates the value at $716,435.24. In other words, all of the commission payments that Martineau earned during the four year period (1999 through 2002) are being included in this calculation. In "quid pro quo" honest services cases, the value received is more apparent and direct in that the defendant did certain things (e.g. voted for a contract or a specific bill) in return for "commission payments" or perhaps a job for another family member. In this case, counsel respectfully asks the Court to evaluate this number ($911,435.24) in light of *U.S. v. Booker*, 543 US 220 (2005), since Mr. Martineau had already developed a substantial business relationship with CVS which extended over 16 years prior to the 1999 legislative session. In fact, it is likely that Mr. Martineau would have earned the commissions from his business with CVS even if he had not been serving in the General Assembly during this period. It is notable that he continued to earn commissions for the same approximate amount of volume business with CVS for the five years after he left the legislature (2003-2007). Due to the nature of the conflicts that existed during the 1999-2002 legislative period, all of the earnings which Martineau received, (pursuant to a basic commission formula which had existed for many years with CVS) a substantial increase in the USSG level for his offense results.

In *United States v. Booker*, 543 U.S. 220 (2005) the United States Supreme Court concluded that the Sixth Amendment applies to the federal sentencing guidelines. The Supreme Court found the government's argument that the Sixth Amendment should not be applied to federal sentencing guidelines was unpersuasive. Justice Breyer, in delivering the opinion of the court in part, concluded that 18 U.S.C. §3553(b)(1), which made the federal sentencing guidelines mandatory, were incompatible with today's Sixth Amendment jury trial and held that that section must be severed and excised from the Sentencing Reform Act of 1984. The court also found that §3742(e) of the Act must be excised and, as so modified, the Act makes the guidelines effectively advisory, requiring a sentencing court to consider guideline ranges (see §3553(a)(4)), but permitting the sentencing court to tailor the sentence in light of other statutory concerns (see §3553(a)). The *Booker* court also found that the Act, without its mandatory provision and related language, remained consistent with Congress's intent to avoid "unwarranted sentencing disparities . . . and maintain sufficient flexibility to permit individualized sentences when warranted" and that the district courts should still consult the guidelines and take them into account when sentencing (see 18 U.S.C. §3553(a)(4)).

The §3553(a) factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterence, to protect the public, and to provide the defendant with needed educational or vocational training or medical care, (3) the kinds of sentences available, (4) the sentencing range established by the United States sentencing guidelines, (5) any pertinent policy statement, (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (7) the need to provide restitution to any victim of the offense. *United States v. Robinson*, 433 F.3d 31, 35 (1st Cir. 2005). In *United States v. Ranum*, 353 F.Supp. 2d 984, 985-87

(E.D. Wis. 2005), the court explained that under *Booker*, the court will treat the guidelines sentence as just one of a number of sentencing factors. In *United States v. Myers*, 353 F.Supp. 2d 1026, 1028 (S.D. Iowa 2005) the court announced that it would treat the guidelines as one of the sentencing factors utilized because treating the guideline range as presumptively reasonable makes the guidelines essentially mandatory. In any given case after *Booker*, a district court should calculate, consult and take into account the same guideline range that it would have applied under the pre-*Booker* mandatory guidelines regime. *United States v. White*, 405 F.3d 208, 219 (4th Cir. 2005). In *White*, the court also noted that the guideline range remains a starting point for the sentencing decision and, if the district court decides to impose a sentence outside that range, it should explain its reasons for doing so.

In the guideline calculation referring to *specific offense characteristics*, Martineau received a 14 level increase pursuant to §2c1.7(b)(1)(A)(ii) of the USSG. That is because the loss calculated was more than $400,000 but not more than $1,000,000. §2c1.1 of the USSG focuses on "fraud involving the deprivation of the intangible right to honest services of public officials" among other offenses. That section does not delineate between the type, or character, of the honest services fraud conviction, but directs the calculator to address "the value of anything obtained or to be obtained by a public official" which is greater than $5,000 by referring to the table contained in §2b1.1 of the USSG. §2b1.1b(1) provides the arithmetic for calculation of the "loss." In the commentary section for §2b1.1, in application note 3(C), *estimation of loss* it indicates that: "the court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based on that evidence. For this reason, the court's loss determination is entitled to appropriate deference." §2b1.1 application note 3(C). The application note in §2b1.1 and §19(C) allows that "there may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be

warranted." In light of this language, and the decision in *Booker*, counsel respectfully believes that the court can fashion a sentence either at the lowest end of the guideline range, or below the guideline range, if the court finds that relevant circumstances exist pursuant to the circumstances of this case.

While Mr. Martineau recognizes the seriousness of his offense, counsel urges the Court to consider that Mr. Martineau had a long established and extensive business relationship with CVS that was based upon real business, real product and real service. That long existing relationship is similar, in many ways, to attorney-legislators who have represented various clients in courts, or other legal matters, and then on another day and time, have that client display an interest in legislation before the General Assembly of which that attorney is also a member. This does not, in any way, diminish the responsibility of disclosing any potential conflict of interest. However, this case is not a quid pro quo case. Based on the structure of the guidelines, the "losses" calculated against Mr. Martineau count every dollar of the commissions he made between 1999 and 2002 during a very long standing business relationship with CVS. Based on the history of this business relationship, it is likely that Mr. Martineau would have earned these commissions regardless of whether he was a member of the General Assembly.

The founding principals of the sentencing guidelines were to create more parity in sentencing while at the same time allowing a court to fashion a sentence that considers individual or unusual characteristics.

In this particular case, Gerard Martineau waived indictment and pled to an information which alleged two counts of deprivation of the intangible right to honest services pursuant to 18 U.S.C. §1343. The essence of Martineau's offense was that he concealed substantial business relationships from the public when he acted, or participated in, legislative activities which may, or did, affect the interests of CVS and Blue Cross. Recently, the Department of Justice has prosecuted a number of

public officials pursuant to the deprivation of the intangible right to honest services doctrine, along with other conflict of interest offenses. The United States Office of Government Ethics publishes a yearly memorandum outlining those prosecutions (A copy of the 2006 Memorandum is enclosed as **Appendix G**). Some of the sentences in these cases are noteworthy in comparison to the facts as presented in this case. For instance, in October, of 2006 OGE noted that U.S. Congressman Robert W. Ney pleaded guilty to one count of a violation of 18 U.S.C. §371, conspiracy to commit multiple offenses including honest services mail and wire fraud (18 U.S.C. §1341, 1343 and 1346), making false statements (18 U.S.C. §1001) and conspiracy to violate the one year lobbying ban as it applied to his former chief of staff (18 U.S.C. §207(e)). Ney also pleaded guilty to one count of making false statements to the U.S. House of Representatives in violation of 18 U.S.C. §1001(a)(2). Congressman Ney had been charged in September of 2006 by the Department of Justice with conspiring with several individuals, including lobbyist Jack Abramoff. Ney was alleged to have intended to influence and induce a series of official actions on Abramoff's behalf. Included in the list of gratuities he was provided by Abramoff was an all expense paid trip to Scotland to play golf, a trip to New Orleans to gamble, and to Lake George, New York to vacation; meals and drinks at Washington, DC restaurants; tickets to use Abramoff's suites to attend sporting events. In exchange, the government alleged that Ney supported or opposed specific legislation at Abramoff's request. Compounding Ney's offenses was that Ney made false statements on government forms with regard to trips he had taken and made further false statements on two of his annual financial disclosure statements.

In January, 2002, Congressman Ney was sentenced to 30 months in prison to be followed by three years of supervised release and was fined $6,000 and ordered to perform 600 hours of community hours for each year of supervised release.

The Justice Department's prosecution of government officials involved in the Abramoff scandal continued with *United States v. Safavian*. Mr. Safavian was chief of staff for the administrator of the General Services Administration. Safavian attended a golf trip to St. Andrews golf course in Scotland sponsored by Abramoff and was transported there by a private jet. Apparently, Safavian informed a GSA ethics official that Abramoff did not have any business with the GSA at the time of the trip to Scotland. Safavian did not tell the ethics official that, in fact, Abramoff was seeking to lease or purchase GSA controlled property and Safavian was assisting him with regard to that project. Subsequently, when GSA's Office of Inspector General began an investigation, Safavian responded falsely to questions put to him during the investigation.

In June 2006, a U.S. District Court jury found Safavian guilty of one count of obstruction of justice under 18 U.S.C. §1505 by interfering with the investigation conducted by the GSA-OIG. The jury also found Safavian guilty of three counts of making false statements or committing acts of concealment under 18 U.S.C. §1001(a) with regard to his communications to the GSA ethics official; to the GSA-OIG agent; and to a Senate committee; and guilty of both concealing his assistance to Abramoff and guilty of concealing, from the GSA-OIG investigation, Safavian's assistance to Abramoff in GSA related activities. In October 2006, Safavian was sentenced to 18 months in prison.

In *United States v. Hadrick Crawford, Jr.*, the government alleged that an FBI special agent, in charge of its El Paso division had accepted substantial gifts from a Mexican race track owner and sometime FBI informant and did not disclose the gifts on his public financial disclosure report. In August of 2006, a federal jury found agent Crawford guilty of violating 18 U.S.C. §1001, by making false statements on his public financial disclosure report for calendar year 2002 and concealing material facts from the FBI regarding his association with the race track owner. In January 2007,

Crawford was sentenced to six months in prison, a $10,000 fine and three years supervised release with 200 hours of community service.

In *United States v. Lester M. Crawford*, an FDA acting commissioner pled guilty to violating 18 U.S.C. §2008, participating in a particular matter in which he and his wife had a financial interest, and 18 U.S.C. §1018, making false writings by failing to disclose his, and his wife's ownership of certain stock and stock options on his public financial disclosure form and in an e-mail response. In February of 2007, Crawford was sentenced to three years of supervised probation and fined $90,000.

These dispositions are reflected in the 2006 Conflict of Interest prosecution survey presented by the United States Office of Government Ethics. While counsel certainly understands that each case is different based on a number of circumstances, what is relevant for consideration here is that a number of highly positioned, full-time government elected and appointed officials have committed offenses involving not only conflicts of interests, but actually covering up those conflicts of interest during investigations. In the Ney case, a sitting United States Congressman not only received gratuities which reflected his access and votes on certain matters of interest to lobbyist Abramoff, but the Congressman actually lied and covered up the activities when presented with forms which required disclosure, or when faced with pertinent questions concerning those activities.

In this case, while the offenses are certainly serious, Mr. Martineau was a part-time member of the legislature. During four years of his 16 year tenure, he admitted that he did not affirmatively disclose, in a public fashion, that two of his substantial clients (CVS and Blue Cross) had matters of interest pending in the General Assembly, of which he was a member and a ranking official. However, Mr. Martineau did not lie or cover up this conflict when confronted by investigators. Quite the contrary, Martineau – five years after leaving the General Assembly – waived his right to a grand jury indictment and entered pleas of guilty to an information filed by the United States Attorney.

Counsel respectfully brings to the Court's attention these other conflict of interest dispositions to illustrate a potential disparity based on the calculation of the loss pursuant to the USSG. Martineau does not, in any way, dispute the seriousness of his not disclosing conflicts of interest when acting on, or participating in, legislation that could have affected two of his larger business clients. However, the number of months that Mr. Martineau must be incarcerated, in the guidelines are followed, is directly related to the income calculation from commissions he earned pursuant to a long-standing relationship with CVS.

In the case of Blue Cross, a stronger connection can be maintained by the government in that Mr. Martineau established that business relationship while he was a ranking member of the General Assembly, did not disclose it, and did not furnish all of the product that was invoiced.

Counsel respectfully submits that *Booker* and 18 U.S.C. §3553(a) allow the Court to fashion a sentence that does take into consideration the guideline range, but also reflects what actually occurred in this case in light of sentences handed down for similar or more egregious conduct.

Here, §3553(a) factors, as a whole, favor a sentence of less than 37 months. Counsel has already addressed the nature and circumstances of the offense. The history and characteristics of this defendant are exceptional and indicate that the behavior in this case was aberrant. Mr. Martineau came from a very modest background, and a large family, and worked and studied very hard to achieve success as a salesman in a very competitive industry. This is not a case of a legislator who had a job fashioned for him or was given a "no show" position. Quite the contrary, Mr. Martineau, in all likelihood, could have earned more income if he had not been devoting time and efforts to work in the General Assembly. The letters which this Court has received attest to the background of this defendant as a law abiding, loyal and devoted family man, whose love is clearly focused on his two sons and his extended family. In a day and age where closeness of family is often a thought, rather

than a reality, Mr. Martineau has made consistent efforts to be a son, brother and, especially a father to his two sons. Letters produced for the Court's consideration indicate a person who was always accessible to friends, constituents and customers and was a person who really listened to their concerns.

Unfortunately, Mr. Martineau made a series of bad judgments in this case, which do not mirror in any way his overall personality or upbringing. These are judgments that he knows he must be held accountable for and that deserve punishment. However, counsel respectfully asserts that this man's life history and characteristics certainly weigh in favor of a sentence at, or below, the guideline range in this case.

Any sentence of incarceration will certainly reflect the seriousness of the offense and promote respect for the law and serve as a deterrent to other persons similarly situated. These factors are things that the Court has to consider and Mr. Martineau understands that. By pleading guilty and being forthright in his dealings with the government and this Court, Mr. Martineau has demonstrated his understanding of the seriousness of the offense and his respect for the law. The Court must also consider how the public will react to this sentence in terms of promoting respect for the law. Counsel respectfully asserts that incarceration, for an individual with Mr. Martineau's background, is going to be a substantial penalty for him and, unfortunately, for his family.

Counsel also respectfully asks the Court to consider the kinds of sentencing available in Mr. Martineau's case. In this regard, counsel respectfully asks the Court to consider a split sentence if the Court determines that incarceration is warranted. If the length of the sentence ordered by the Court allows for a split sentence, Mr. Martineau would be eligible for home confinement. Mr. Martineau has met with Ms. Kathy O'Malley of the Providence Chapter of Habitat for Humanity. As a result of this meeting, Ms. O'Malley indicated that the group would welcome Mr. Martineau's services. If Mr.

Martineau were allowed a period of home confinement, he would work, in a very basic level, at Habitat for Humanity.

A period of community confinement, in which Mr. Martineau would have to provide community service, on a day to day basis, would certainly be of great value to society and to his community and constitute a substantial period of physical work and rehabilitative reflection.

**X. SUMMARY**

In summary, this defendant has fallen a long, long way from the position he once held in life. Mr. Martineau was charged for activities that occurred nine years ago and ended six years ago. He has lost his business and income and has been publicly chastised and humiliated. When viewing a defendant in this light, one can say that individual put himself in that position and must accept the consequences. Unfortunately, those consequences can, at times, be unduly harsh. However, our judiciary is an independent judiciary that has been vested with the very heavy duty of sentencing individuals who have committed unlawful conduct and must receive due punishment. When considering the type and manner of punishment, §3553(a) allows the Court to consider a number of factors which counsel has outlined above.

In this case, the Court has before it a man who is truly remorseful; recognizes that he must be held accountable; but asks the Court for consideration of how he has lived his life in comparison to the unfortunate events which have brought him before this Court.

For some people, no amount of incarceration or misery would be enough for a fallen politician. That, however, does not present the complete picture of the person the Court has before it. On a personal note, both counsel for Gerard Martineau, have known him as a friend for many years, and can state, unequivocally, that he been a man of principle, loyal to family and friends, a man of faith and someone who, in the future, can contribute to his community. Hopefully, the Court can see,

pursuant to all the circumstances in this case, that this is an individual who is a good man who did wrong.

Counsel respectfully requests the Court to consider a sentence of limited incarceration along with community confinement to allow this man to return to his family and to begin to rebuild his life and reputation.

Respectfully submitted,

**PANNONE LOPES & DEVEREAUX LLP**

/s/ William P. Devereaux
William P. Devereaux (#2241)
317 Iron Horse Way, Suite 301
Providence, RI 02908
Tel.: (401) 824-5100
Fax: (401) 824-5123
wdevereaux@pldlaw.com

**LAW OFFICES OF JAMES E. O'NEIL**

/s/ James E. O'Neil
James E. O'Neil (#2097)
The Meadows, Suite A-103
1130 Ten Rod Road
North Kingstown, RI 02852
jameseoneil@cox.net

**CERTIFICATON**

I hereby certify on this 14th day of February, 2008, this document was filed electronically and is available for reviewing and downloading to the ECF registered counsel of record.

Gerald B. Sullivan
U.S. Attorney's Office
50 Kennedy Plaza
8th Floor
Providence, RI 02903
gerard.sullivan@usdoj.gov

/s/ William P. Devereaux

#8336