# F

The Providence Journal projo.com

## Rhode Island news

# House leader did business with CVS, Blue Cross

**Gerard M. Martineau sold bags to CVS and Blue Cross while he was in a position of influence at the State House.**

10:09 AM EST on Sunday, November 21, 2004

BY MIKE STANTON
Journal Staff Writer

First of two parts

Digital extra

Read Part 2 of Journal staff reporter Mike Stanton's series on this topic

When Gerard M. Martineau first ran for state representative, in 1986, he campaigned against elected officials "who practice self-service rather than public service."

Seventeen years later, in 2002, when he left the State House after rising to House majority leader, Martineau spoke of the challenges of balancing his public duties and his private business.

Two of his customers were CVS and Blue Cross & Blue Shield of Rhode Island, companies that regularly lobbied the General Assembly on health-care legislation.

A Providence Journal investigation has found that Martineau, while he was in a position to influence legislation affecting CVS and Blue Cross, was profiting from his private business with those companies.

Martineau was selling bags to CVS, including the familiar white plastic bags with the red CVS logo, when he voted against pharmacy-choice legislation in 1995.

Later, as majority leader, Martineau was instrumental in the passage of laws regulating health care and Blue Cross, the state's largest health insurer.

"I am more committed to [health care] than any other because of the effect it has on so many folks," Martineau said in 2000, as cohost of a state health-care summit.

In June of that year, the same month that the General Assembly passed Martineau's sweeping Health Reform RI 2000 Act, Blue Cross began buying paper bags from him. Over the next few years, Blue Cross purchased hundreds of thousands of bags, and distributed them to some of the pharmacies in its restricted network.

Blue Cross paid CVS to run the network of some 120 drugstores, about a third of which were CVS pharmacies. The network also included Brooks drugstores and independent pharmacies.

The legislature had repeatedly rejected legislation that would have allowed Blue Cross customers to get their prescriptions filled at any drugstore in Rhode Island, as opposed to just those in the network.

Legislators and state health officials who worked with Martineau said that he seemed fair in his handling of complex health-care matters. But they said that they were unaware of his private business dealings, and wish that he had disclosed them.

"Any time there's a situation where there's even a perception of a conflict, your obligation is greater to disclose it," said former Rhode Island Human Services Director Christine C. Ferguson, who worked closely with Martineau. "Our perception of democracy is based on the people we elect making policy because they're representing their constituents -- not because their livelihood is at risk or can be substantially enhanced."

CVS and Blue Cross confirmed their business relationships with Martineau, but said that politics was not a factor.

According to CVS, it buys millions of bags a year from three companies. Martineau is the manufacturer's representative for one of those companies. CVS declined to say how much it has paid Martineau's company.

The Woonsocket-based drugstore chain, the nation's largest with 5,300 stores, said in a statement that it has dealt with Martineau for more than 22 years -- a "business relationship [that] predated Mr. Martineau's joining the legislature by five years."

According to CVS, its president Thomas M. Ryan and Martineau have known one another over the years and are friendly, but they don't socialize.

Martineau declined to be interviewed, and said in an e-mail that he is proud of his public service.

Scott Fraser, a spokesman for Blue Cross, said only that the company paid fair market value for Martineau's bags and that it was "an insignificant amount." The arrangement, which ended the year after Martineau left the State House, had no connection to his role in the House leadership, said Fraser.

"They're two separate issues," said Fraser. "He received fair value for his services, and we got what we paid for."

This year, the General Assembly has been racked by influence-peddling scandals involving key lawmakers and their involvement with CVS and Blue Cross.

While Martineau left the State House two years ago, his relationship with the health-care industry illustrates the potential for conflict inherent in a part-time legislature whose members need to earn a living.

*'A kid from Woonsocket'* IN THE WANING days of the 1998 General Assembly session, Gerry Martineau turned 40, and his colleagues elected him House majority leader.

As second in command to Speaker John Harwood, Martineau was in a position to direct the flow of legislation and arbitrate disputes among lawmakers and lobbyists, both on the House floor and in private meetings of the House leadership.

Likeable and even-tempered, with a reputation for fairness and loyalty to the leadership, Martineau had been the chairman of the House Corporations Committee.

"This is a big deal for a kid from Woonsocket," Martineau said of his election as majority leader.

Martineau grew up in the blue-collar Globe district of Woonsocket, one of eight children of French-Canadian immigrants from Quebec. He attended Mount St. Charles Academy, where his older brother had been a classmate of John Harwood, and went on to St. Anselm's College in Manchester, N.H.

After he graduated in 1981, he sold business equipment for a year, then joined a packaging distributor in Mansfield, Mass.

As a manufacturer's representative, Martineau sells retail and industrial packaging and packaging materials -- bags, cushioning, tape, tissue paper, etc. --made by companies that lack their own sales forces. Martineau works for commission.

Beginning around 1982, one of his clients was CVS, then a much smaller, regional drugstore chain headquartered in Woonsocket. According to CVS, Martineau was among the manufacturer's representatives the company dealt with to buy paper and plastic bags for its stores.

In 1986, Martineau entered the Democratic primary to succeed a veteran Woonsocket state representative, Richard P. Kearns, who was retiring. Martineau, who was 27, upset the party's endorsed candidate, promoting himself as a "meaningful alternative to the stale status quo" and criticizing "elected public officials who practice self-service rather than public service."

Martineau was assigned to the House Corporations Committee, a natural home for a legislator with a business background. He developed a reputation for being dependable, candid and forthright, a good listener who could navigate the egos on Smith Hill.

Sales and politics, he noted in a 1998 interview with The Journal, have a lot in common.

"It's got me closer to the customer, being a small-business guy," he explained. "There's nobody calling on the customer for me. I don't have a national advertising operation. If I'm not making the sale, then it's not being made. . . . Customers don't leave you; you send them away. And that's true with people on the [House] floor as well."

*'CVS is in my district'* In 1993, having sided with Harwood in his battle for House speaker, Martineau joined Harwood's leadership team and was named chairman of Corporations.

Two years later, in 1995, the vice chairman of Corporations, Rep. Brian Patrick Kennedy, D-Hopkinton, introduced a little-noticed, three-page bill requiring health insurers to cover prescriptions at any pharmacy in Rhode Island.

Kennedy, in recent interviews, said he introduced the bill on behalf of a constituent who ran an independent pharmacy in Westerly. Independent pharmacists were concerned because Blue Cross, the state's largest health insurer, had created a network of CVS and Brooks pharmacies and would only pay for prescriptions filled there.

Blue Cross defended the network as a means to negotiate better prices for its subscribers. But the independent pharmacies complained that they were being squeezed out by the bigger chain drugstores.

According to Kennedy, Martineau told him that he had "issues" with the legislation -- that "CVS is in my district, and they're a good corporate citizen" -- but that he would "step back" and not hold up the bill in committee. Martineau never told him that he sold bags to CVS, said Kennedy.

State House records show that the Corporations Committee voted, 11-3, to approve Kennedy's bill, with Martineau voting against it. The full House went on to approve the bill overwhelmingly. Martineau was not at the State House that day and therefore did not vote, according to the House Journal for April 25, 1995.

The bill was then sent to the Senate, where it died in the Senate Corporations Committee.

The bill followed the same path in 1996. Once again, House Corporations approved it, after a hearing in which a lobbyist for CVS testified against it. Records do not indicate how -- or whether -- Martineau voted in committee, but he did vote for the bill when the full House unanimously approved it. Once again, the bill died in Senate Corporations.

Martineau did not vote on the bill in 1997 or 1998, either in committee or on the House floor, as it sailed through the House both years, only to die in Senate Corporations each time.

Kennedy remained unaware of Martineau's business ties to CVS. He said he was focused on a problem in the Senate: Sen. William Irons, D-East Providence, the chairman of Senate Corporations, where Kennedy's bill had repeatedly died.

Kennedy said it was common knowledge throughout the State House that Irons was friends with Ryan, the chief executive of CVS. However, Kennedy said, he was not aware -- until reports in The Providence Journal early this year -- that Irons, an insurance man, was receiving tens of thousands of dollars in broker commissions on a Blue Cross health-insurance policy for CVS employees.

"I'm surprised [that Martineau was selling bags to CVS], but at the same time, it would help explain why he didn't vote on the bill," said Kennedy. "If it was going to die, it was because of Billy Irons, not Gerry Martineau. It didn't matter what the House did. Irons was a major stumbling block."

Once, Kennedy said, Harwood pulled him aside and confided, "Hey, I'm doing my best to pass your bill, but you know about Irons and Ryan and CVS." (Harwood did not return calls seeking comment.)

Toward the end of the 1998 session, Martineau became majority leader and Kennedy was named chairman of House Corporations.

The following year, the pharmacy-choice debate at the State House heated up -- but this time without the support of Kennedy, its onetime champion.

Kennedy said he dropped his efforts to pass the bill because Blue Cross had expanded its network to 128 pharmacies, including not only all of the CVS and Brooks stores in Rhode Island, but all of the state's 41 independent pharmacies.

Nevertheless, angry senior citizens and lobbyists for Walgreens and Stop & Shop -- stores excluded from the network -- pushed hard for pharmacy-choice legislation in 1999. Stop & Shop and Blue Cross ran expensive advertising campaigns. The two sides touted conflicting information about whether a restricted network saved money or cost more.

In April 1999, more than 200 people packed the State House's largest meeting room for a hearing before Kennedy's House Corporations Committee. One week later, the Corporations Committee voted unanimously to reject pharmacy-choice legislation.

In the following years, other lawmakers picked up the banner of pharmacy choice. But various versions died in House and Senate Corporations in 2000, 2001 and 2002.

Since the bills never made it out of committee, Martineau never had to take a public stance. But Kennedy said that he would send color-coded lists to Harwood and Martineau of all the bills in his committee, recommending which ones should pass in green and which ones should die in red. He listed the pharmacy-choice bills in red.

"I'd send the lists up to the leadership and they'd send back down sheets with the bill numbers that they wanted passed," said Kennedy.

The sheets came from Martineau's administrative assistant, he added. The pharmacy-choice bills were not included. Since Kennedy agreed from 1999 forward that the bills shouldn't pass, he said, he cannot recollect any conversations with Martineau or Harwood about the subject.

Rep. John J. DeSimone, D-Providence, was one of the legislators who sponsored pharmacy-choice legislation from 1999 through 2002, when Martineau was majority leader. He never had any conversations with Martineau about the issue, nor, he said, did he have to, to know where things stood.

"I knew the leadership was against us," he said. "You never get the committee voting it down, 12-2, if the leadership is not opposed. They took their marching orders from the leadership."

*'You should recuse yourself'* WHEN MARTINEAU was majority leader, CVS lobbyists registered at the State House to take positions on several other, lesser-noticed bills of interest to the drugstore chain. During those years, House and Senate leaders killed bills, opposed by CVS, that would have outlawed profiteering on drug sales, allowed the importation of cheaper prescription drugs from Canada, required drug discounts for senior citizens, and created a state board to survey and regulate "excessive" drug costs.

While there were arguments on the merits of both sides, Kennedy said that Martineau's business relationship with CVS raises the appearance of a conflict. Kennedy said he wished Martineau had disclosed the relationship.

DeSimone echoed Kennedy. In his view, DeSimone said, "If you have a business relationship with an entity that has some interest in pending legislation, you should recuse yourself or at least file a disclosure with the state Ethics Commission."

In his annual financial disclosure forms to the Rhode Island Ethics Commission, Martineau lists his own business, the Upland Group, as his source of income, without identifying his customers.

Under state ethics law, Martineau would not have been required to disclose his clients, or refrain from participating in legislation affecting them, unless the client would be affected "to a greater or lesser extent" than other affected companies. That would have to be determined on a case-by-case basis, according to an official with the Rhode Island Ethics Commission.

Martineau never had to take a public position on many of the bills opposed by CVS because they died in

committee.

As a member of the House leadership, Martineau was in a position to influence legislation behind closed doors, said Kennedy, the current Corporations chairman. And the leadership routinely sent Kennedy lists of bills that it wanted passed, he noted.

Martineau declined to talk to The Journal about any role he played in determining the fate of legislation of interest to CVS.

In 2001, the General Assembly overhauled the state's outdated pharmacy laws. When the bill came to the House floor for a vote, Martineau voted against a proposed amendment, opposed by CVS, that would have required pharmacies to post the price of top-selling prescription drugs. After the amendment was defeated, Martineau joined the majority in voting to pass the bill, according to the May 1 House Journal.

In 2002, Rep. Steve Smith, D-Providence, sponsored consumer legislation requiring retailers, including drugstores, to accurately post their prices. CVS and other businesses opposed the measure, which died in committee.

"Those issues go upstairs, where the leadership decides what's going to pass," said Smith. "There was a lot of talk at the State House that Martineau did business with CVS, although I never knew for sure.

"CVS always had a very strong influence and presence at the State House, as we saw in the pharmacy-choice debate,' he continued. "The fact that bills they opposed didn't pass tells me that they had a very close, influential relationship with the leadership."

*He worked on commission* MEANWHILE, Martineau had launched his own company.

In 1997, after the company he worked for was sold, Martineau started the Upland Group, working out of his house on Upland Road in Woonsocket.

"When the company was bought, it was an opportunity for me to do what I really wanted to do, and that was to go out on my own and try to build my own firm," he told The Journal in 1998.

Martineau was allowed to take his sales accounts -- "relationships that I had developed." His former boss, Richard Madigan, said that the arrangement was unusual, but "it was something that was an amicable relationship, and we felt if it benefited him, it was fine with us."

One of those accounts was CVS.

CVS, for proprietary reasons, declined to say how much business it does with Martineau's Upland Group, or how much it spends overall on plastic and paper bags. A company spokesman said that Martineau has represented various companies through the years that supplied CVS with bags, and that he represents one of the three manufacturers that currently supplies the drugstore chain with millions of bags a year.

The year that Martineau started the Upland Group marked a period of steady expansion for CVS. The growth of managed health care and its affect on the pharmacy business fueled a wave of acquisitions that has seen CVS grow from 1,425 stores in early 1997 to 5,300 today.

In a statement, CVS said Martineau "has acted as a manufacturer's representative for companies that sell CVS in-store paper and plastic bags. . . . We also procure bags from a number of other companies that are not represented by Mr. Martineau."

CVS said that it chooses its manufacturers through a detailed bidding process that "focuses on cost, quality, service and capacity."

In the 1998 Journal interview, Martineau said that he worked on commission, selling 12 lines of packaging and materials to large companies in the United States and Canada that buy packaging by the truckload. He said he had "a relatively small customer base" of about 25.

Martineau said that his company's annual sales, in its second year of operation, were $5 million to $7 million.

*'The way it is in Rhode Island'* IN JUNE 2000, Martineau took on a new customer at the Upland Group: Blue Cross & Blue Shield of Rhode Island.

The year before, with Blue Cross struggling financially and amid talk of selling the nonprofit insurer to a for-profit company from out of state, Martineau had sponsored the landmark Health Insurance Conversion Act, which increased the state's ability to regulate such sales or mergers.

Health care had become a dominant issue at the State House. As the House majority leader, Martineau dealt with lobbyists from Blue Cross and other health-care concerns. Toward the end of the 2000 session, Blue Cross began buying bags from Martineau.

According to Blue Cross spokesman Fraser, the company signed a contract for the Upland Group to provide paper bags to the 29 independent pharmacies in Blue Cross' restricted pharmacy network. Anyone who got a prescription filled at those drugstores would have it put in a bag printed with the Blue Cross logo.

Fraser said Martineau approached Blue Cross to propose the contract and made a presentation at the insurer's headquarters in Providence. The contract was signed by Michael Sisti, then Blue Cross' assistant vice president for corporate communications, in charge of advertising and promotion.

"It was another way of advertising the Blue Cross-Blue Shield name, of getting our name out there," said Fraser.

The bags cost $19.50 per thousand, making them a cost-effective means of advertising compared with television, radio and newspaper ads. "Only billboards would be cheaper," said Fraser.

Sisti said Martineau showed him samples of paper bags that the Upland Group sold to big drug manufacturers, which were then distributed to pharmacies at chain drugstores, including CVS, to advertise "blockbuster drugs" like Claritin.

In response to inquiries from The Journal, Blue Cross earlier this year asked its advertising agency, Rivers Doyle & Walsh, to analyze the Martineau contract. Compared with five other vendors with whom Blue Cross does business, Fraser said that "the price we paid was in the middle."

Over the next 2 1/2 years, Blue Cross purchased "hundreds of thousands" of bags from Martineau, said Fraser. He declined to be more specific. Sisti, who no longer works for Blue Cross, said he couldn't

remember the dollar amount of the contract, but said that it wasn't significant.

Blue Cross stopped buying bags from Martineau in February 2003, about two months after he left office. Fraser said there was no connection.

"It had run its course," said Fraser.

In response to ethics scandals this year regarding Blue Cross' relationship with state legislators, the insurer has tightened its rules regarding dealings with politicians. Under a new code of conduct adopted in the spring, the company said, the contract with Martineau would have been prohibited because he was a lawmaker.

During the 2000 session, more than 150 bills pertaining to health care were introduced. Martineau co-chaired a working group of state health officials, lawmakers and lobbyists.

"There is a delicate balance that must be maintained in our health-care system," said Martineau at the time. "We cannot allow one sector in our health-care system to survive at the expense of another. . . . We want to be fair and evenhanded with all players . . ."

In June 2000, the month that Blue Cross first agreed to buy bags from Martineau, the House unanimously passed another major piece of legislation sponsored by the majority leader, Health Reform RI 2000.

The 87-page bill addressed everything from health coverage for the poor to insurance rates for small businesses to the reserves that insurers are required to have. The state also agreed to set aside millions of dollars to entice Blue Cross and its competitor, UnitedHealthcare, to cover more of the state's uninsured poor.

Fraser, who was a Blue Cross lobbyist, said that his legislative dealings with Martineau had nothing to do with the Upland Group's bag contract with Blue Cross.

"We dealt with Gerry on a bunch of things," said Fraser. "I've been trying to remember if I knew about [Martineau's bag contract] at the time. I think I knew he was coming in to make a pitch."

Fraser said he's not sure how he became aware that Martineau was coming to Blue Cross to make a pitch.

"That's the way it is in Rhode Island," he said. "You might run into a senator or a representative at the IGA, or in the pizza place."

Christine Ferguson, the former Rhode Island human services director who worked with Martineau on health-care reform, said she was surprised to learn from a reporter recently of Martineau's business dealings with CVS and Blue Cross.

"My dealings with Gerry Martineau were always very good," said Ferguson, now the Massachusetts public health commissioner. "I never had the sense that he had another agenda. He listened and learned and asked good questions. I always thought he did a good job trying to work through the issues -- issues that were very controversial."

Informed of Martineau's business dealings with CVS and Blue Cross, she said, "Wow!"

Then, after a pause, she continued: "This raises a larger set of issues, in a state as small as Rhode Island, where there are so few players in health care. There's a higher responsibility in a small market to pay attention to what is or appears to be a conflict of interest and what isn't.

"My dilemma with Gerry is that he was up-front with a lot of stuff, and I didn't know about this."

Disclosure, Ferguson added, "wasn't normal" in the State House's political culture.

"I'm not surprised at Blue Cross," said Ferguson. "They were doing exactly what every incentive of the system allowed them to do. The question is how we create an environment where this is unacceptable."

Sen. Elizabeth Roberts, D-Cranston, who also worked with Martineau on the health-care task force in 2000, said she never saw him do anything that raised questions in her mind regarding his fairness or objectivity.

"All of us in the legislature need to do more and look carefully at our business contracts and clients and how that connects with the work that we do," she said.

*'I never took this responsibility lightly'* IN JUNE 2002, during the final weeks of the legislative session, Martineau announced that he would not seek reelection after 16 years in the General Assembly. He was 43.

He spoke of the need to balance his obligations to his family, his business and his legislative colleagues and constituents.

"That fact is that, over the last several months, my business responsibilities have become more demanding and it is becoming increasingly difficult to reconcile this balance as I look to the months and years ahead," he said.

"I have enjoyed immensely my opportunity to serve this chamber," he told his colleagues. "All of you, I think, that know me understand I never took this responsibility lightly."

He had tried "in some modest way" to improve the system, he said, adding, "I am confident I have done that."

Last month, Martineau was back in his old political element, joining friends and former colleagues at the Providence Marriott for a charity roast of former House colleague Vincent J. Mesolella Jr.

He joked that a Journal reporter should turn off his tape recorder, then shared his reminiscences.

In the weeks since, Martineau has declined to be interviewed for this story.

"As you know, I have been out of public life for two years and have by choice avoided any reengagement in the political arena," he wrote in an e-mail. "That is the posture I wish to maintain."

He also wrote: "I am proud of my public service and remain confident that your conversations with a number of my former colleagues in government will reflect favorably on my handling of the many complex issues we faced.

"Respectfully,

"Gerry Martineau."

Tomorrow: Martineau and top Rhode Island lawmakers took industry-paid trips to resort hotels in Florida and California to attend conferences.

Mike Stanton can be reached at (401) 277-7724, or mstanton [at] projo.com