G

United States
Office of Government Ethics
1201 New York Avenue, NW., Suite 500
Washington, DC 20005-3917

August 22, 2007
DO-07-030

MEMORANDUM

TO: Designated Agency Ethics Officials and Inspectors General

FROM: Robert I. Cusick
Director

SUBJECT: 2006 Conflict of Interest Prosecution Survey

This Office has completed its annual survey of prosecutions involving the conflict of interest criminal statutes (18 U.S.C. §§ 202-209) for the period January 1, 2006, through December 31, 2006. Information on twelve new prosecutions by U.S. Attorneys' offices and the Public Integrity Section of the Department of Justice's Criminal Division was provided to us with the assistance of the Executive Office for United States Attorneys in the Department of Justice. Summaries of the prosecutions reported to this Office for past years can be found on our web site at www.usoge.gov under "Laws and Regulations."

## 2006 CONFLICT OF INTEREST PROSECUTION SURVEY

1. United States v. David H. Safavian

From 2002 to the beginning of 2004 David H. Safavian served as the Chief of Staff for the Administrator of the General Services Administration (GSA). In 2002 lobbyist Jack Abramoff invited Safavian and several other Government officials and lobbyists on a golf trip to St. Andrew's golf course in Scotland. Abramoff was to provide a private jet for transportation. In June 2002, Safavian contacted his ethics official and asked for an opinion about whether he could participate in the trip.

When he asked for the opinion, he informed the ethics official that Abramoff did not have any business with GSA at the time of the invitation and that he did all of his work on Capitol Hill. But Safavian did not tell the ethics official that, in fact, Abramoff was seeking to lease or purchase GSA-controlled property and that he (Safavian) was assisting him with regard to that project. Based on the information Safavian provided, the ethics official indicated that acceptance of the trip was permissible.

Safavian then accompanied Abramoff and the others on the trip. Several months later, after receiving an anonymous tip, the GSA Office of the Inspector General (GSA-OIG) opened an investigation into the trip. Almost a year after that investigation was opened, the *Washington Post* published the first of a series of articles about Abramoff's dealings with several Indian tribes. The articles prompted the Senate Committee on Indian Affairs to conduct an investigation into the trip. Safavian was questioned about his involvement in the trip during both investigations. He responded to the questions verbally and by providing documents. To both the GSA-OIG investigator and the committee he made statements similar to those he had made to the ethics official.

In June 2006 a jury found him guilty of one count of obstruction of justice under 18 U.S.C. § 1505, interfering with the investigation by the GSA-OIG. They also found him guilty of three counts of making false statements or committing acts of concealment under 18 U.S.C. § 1001(a) with regard to his communications to the ethics official, to the GSA-OIG agent, and to the Senate committee: (1) guilty of both concealing his assistance to Abramoff

in GSA-related activities and of falsely stating to the GSA ethics official that Abramoff did all of his work on Capitol Hill when Safavian knew that prior to the trip Abramoff was seeking to lease or purchase GSA-controlled property; (2) guilty of concealing from the GSA-OIG agent his assistance to Abramoff in GSA-related activities; and (3) guilty of falsely stating in a letter to the Senate committee that Abramoff did not have any business with GSA at the time he invited Safavian on the trip when Safavian knew that Abramoff was seeking to lease or purchase GSA-controlled property.

In October 2006, he was sentenced to 18 months in prison.

The Public Integrity Section of the Criminal Division of the Department of Justice handled the prosecution.

2. United States v. Dr. Pearson "Trey" Sunderland III

As the Chief of the Geriatric Psychiatric Branch of the National Institute of Mental Health (NIMH), Dr. Trey Sunderland supervised NIMH's geriatric research on Alzheimer's disease, including the creation and management of collaborations with outside partners, such as other governmental agencies, educational institutions, and businesses.

As a senior employee at the agency, Sunderland was required to disclose annually on his confidential financial disclosure report (OGE Form 450) the income he earned from outside employment arrangements (including consulting work) and travel expenses over $260. In addition, before he engaged in outside employment, he was required to file a form with his agency ethics official disclosing the name of the outside entity, the nature of the proposed employment, and the compensation to be paid.

In 1997 representatives of Pfizer, Inc. approached Sunderland about the possibility of the NIMH joining with its researchers on a project to uncover new Alzheimer's biomarkers in the blood or cerebral spinal fluid of Alzheimer's patients. Sunderland agreed to the collaboration between NIMH and Pfizer. Between 1998 and 2003, Sunderland and his staff worked in their official capacities on this project with Pfizer. In 1998, Sunderland also initiated negotiations with Pfizer to work as a consultant on the same project. During the next five years he worked as a consultant for Pfizer on this project. He received retainer fees of $125,000,

additional fees totaling $35,000 for attending 14 one-day meetings at Pfizer, and related travel expenses.

Also in 1998 Sunderland asked Pfizer to participate in another research project at NIMH to compare levels of known biomarkers present in the cerebrospinal fluid of Alzheimer's patients. Pfizer accepted. Between 1998 and 2003 Sunderland, as an employee of NIMH, worked with Pfizer on this project. But in July 1998, Sunderland negotiated with Pfizer to be paid as a consultant for his work on this same project. Over the next five years he served as a consultant to Pfizer on the project and was paid $125,000 in retainer fees.

Sunderland did not disclose to his supervisors at the NIMH the existence of the Pfizer consultancy for the two research projects, or the fees and expenses paid to him. He also failed to receive authorization from the ethics officials to engage in the consultancy.

In December 2006 Sunderland pleaded guilty to a violation of 18 U.S.C. § 208(a). Later that month he was sentenced to two years' probation. He was also ordered to forfeit $300,000 and to perform 400 hours of community service.

The District of Maryland handled the prosecution.

3. United States v. Ryan H. Rainey

Ryan H. Rainey served as a senior trial attorney in DOJ's Civil Rights Division, Special Litigation Section, from January 2002 through April 1, 2005. Prior to joining the Civil Rights Division, he served as an Assistant United States Attorney in the District of Columbia for seven years. During his time in the Civil Rights Division, his responsibilities included investigating alleged civil rights abuses of persons confined in certain institutions owned or operated by, or on behalf of, state and local governments.

On April 3, 2003, the DOJ Civil Rights Division opened an investigation into alleged civil rights abuses at a juvenile correctional facility located in Stockton, California. Rainey served as the lead counsel in the Department's investigation. But from February 2004 to June 2004, while serving as lead counsel for the Department in the investigation, Rainey was negotiating employment with the state of California to serve as a special master appointed to monitor and oversee the

state's reform of its juvenile facilities. One of those facilities was the one that was the subject of the on-going DOJ investigation. Rainey did not disclose the employment negotiations to his supervisors. When the supervisors learned of the negotiations in June 2004, they removed him from the investigation into the Stockton facility.

In June 2006 Rainey pleaded guilty to violating 18 U.S.C. § 208(a), participating personally and substantially in a Government investigation of an entity while negotiating for employment with that entity. In his guilty plea, he also admitted that he attempted to obstruct the Government's investigation into his conduct by lying to investigators and then contacting a witness in an effort to conceal his lie. In September 2006 he was sentenced to one year of probation and ordered to pay a $3,000 fine.

The Public Integrity Section of the Criminal Division of the Department of Justice handled the prosecution.

3. United States v. Natalie Coker and United States v. Dennis Michael Barrett

Natalie Coker was the Associate Director of the Department of Veterans Affairs (VA) Consolidated Mail Outpatient Pharmacy (CMOP) in Murfreesboro, Tennessee. Her supervisor, Joseph Haymond, was the director of CMOP. Dennis Michael Barrett was the owner/operator of a company that earned commissions from private companies by placing the companies into contracts with the VA.

In the summer of 2002, Coker and Haymond wanted Barrett to find a company that could repackage or prepackage pharmaceuticals for the CMOP. Barrett mentioned this to his business partner, Kevin Bowling. Bowling responded that his father-in-law, Bob Allen, might be interested. Barrett met with Bowling and Allen, who did express an interest. Barrett set up and attended a meeting with Bowling, Allen, Coker, and Haymond. Coker explained the type of service she was looking for and provided logistical information. At the meeting it was determined that Coker would gather applicable quantity and pricing information, and that Coker and Haymond would give the contract to Allen.

Allen then formed a company called PrePak Systems, Incorporated, which he owned along with Bowling and two others. Coker personally helped PrePak during the initial

stages of its organization by finding equipment, finding suppliers of bottles, and dealing with regulatory issues. With Haymond, Coker also went to PrePak's business location, checking out its size and location, looking at equipment, and advising PrePak as to Government requirements.

In addition, Coker helped Allen obtain a letter from the CMOP to show to lenders that expressed the CMOP's interest in doing business with PrePak. She also helped PrePak understand issues related to quantity and pricing of prepackaged drugs.

Coker subsequently awarded the contract to PrePak without competitive bidding. Barrett, who received a commission on what the CMOP was paying PrePak, estimated that CMOP paid PrePak hundreds of thousands of dollars for this work.

During this time, Coker was negotiating for employment with PrePak. Allen asked Barrett whether Coker or Haymond would be interested in a position with PrePak as a full-time pharmacist. Barrett responded that Coker might be interested. Allen talked with Coker, who was receptive to Allen's offer. She negotiated with Allen regarding prospective employment with PrePak through a series of e-mails with Allen. In these e-mails, they discussed possible terms of employment, including compensation, relocation to Cookeville, Tennessee, and a work schedule. Ultimately, she declined the offer of employment. Coker had received periodic ethics training, which included the restrictions on negotiating for employment.

In March 2006 Coker pleaded guilty to violating 18 U.S.C. § 208(a), participating personally and substantially in a particular matter involving PrePak while negotiating for employment with the company. On October 16, 2006, she was sentenced to 46 months in prison and a $10,000 fine. Barrett also pleaded guilty of violating 18 U.S.C. § 208 (a) and was sentenced on October 19, 2006 to two years probation and a $5,000 fine.

The Middle District of Tennessee handled the prosecution.

5. <u>United States v. Bobby L. Jolley</u>

Bobby L. Jolley, the director of the War Fighting Center at I Corps at Fort Lewis, Washington, was required to file annually a confidential financial disclosure report (OGE

Form 450). In that report he was required to list his assets and income, among other financial information. Jolley owned a ranch called Woodland Farm. He failed to disclose his ownership of the ranch on the OGE Form 450.

Jolley pleaded guilty to one count of violating 18 U.S.C. § 1018, making and delivering a false certificate or writing. He was sentenced to six months unsupervised probation and a $2,500 fine.

The Western District of Washington handled the prosecution.

6. <u>United States v. Anthony Mingo</u>

From mid 2003 until late 2004, Anthony J. Mingo was a paid consultant to Management Control Systems (MCS), a small Government contractor owned by Nadine Lucas. In the summer of 2003, Mingo helped prepare the paperwork necessary for MCS to obtain a GSA contract to supply IT services and parts to the Department of Public Works at the Navy base at Dahlgren, Virginia. In connection with the GSA contract, Mingo and Lucas received significant help from a Navy civilian employee, Michael Causer, the Supervisor of Public Works at the Dahlgren facility. Shortly after Lucas' company was awarded the GSA contract, Lucas told Mingo that she wanted to reward Causer for his assistance in obtaining the contract. Causer had previously told Lucas that he wanted to buy a tractor for his five-acre residence. Mingo discussed the matter with Causer and in November 2003 arranged for the purchase of a $22,000 Kioti tractor and delivered it to Causer's residence. Mingo also helped facilitate bid rigging that Causer had engineered in order to direct additional Dahlgren business to Lucas' company.

In December 2006 Mingo pleaded guilty to violating 18 U.S.C. § 209, illegally supplementing the salary of a Federal official by purchasing a new tractor for him. He was sentenced to two years supervised probation, a $12,000 fine, and 150 hours of community service. Causer had pleaded guilty to his role in the bid rigging scheme in November 2006. He was sentenced to 15 months in prison and ordered to pay $252,000 in restitution to the United States. In February 2007 Lucas pleaded guilty to conspiracy to pay illegal gratuities to a Federal official (Causer). She was sentenced to four months in prison and an additional four months of home detention. She was also ordered to pay $20,000 in restitution.

The Eastern District of Virginia handled the prosecution.

7. United States v. Cynthia Jameson

Cynthia Jameson, an employee of the General Services Administration (GSA), was the Director of the Kentucky Property Management Center at the GSA office in Louisville, Kentucky. In this position, she had authority over a number of GSA contractors, including one contractor who employed Jameson's live-in companion. Jameson also had two dependent children who were employed by the same GSA contractor on an intermittent basis. During the time that her live-in companion and children worked for the contractor, Jameson participated personally and substantially through the decision, approval, and recommendation of Government contracts to that contractor, actions that financially benefited her.

In August 2006 Jameson pleaded guilty to violating 18 U.S.C. § 208(a) by participating in the approval or recommendation of a Government contract in which she had a financial interest. She was sentenced to 24 months probation, a $1,000 fine, and a $25 special penalty assessment.

The Western District of Kentucky handled the prosecution.

8. United States v. Hardrick Crawford, Jr.

While serving as the Special Agent in Charge of the FBI's El Paso Division, Hardrick Crawford, Jr. accepted substantial gifts from a Mexican racetrack owner and sometime FBI informant. In addition, Crawford did not disclose the gifts on his public financial disclosure report (SF 278).

In August 2006 a Federal jury found Crawford guilty of violating 18 U.S.C. § 1001, making false statements on his public financial disclosure report for calendar year 2002 and concealing material facts from the FBI regarding his association with the racetrack owner. In January 2007 Crawford was sentenced to six months in prison, a $10,000 fine, and three years supervised release during which time he must complete 200 hours of community service.

The Western District of Texas handled the prosecution.

9. United States v. Robert W. Ney

From January 1995 to January 2007 Robert W. Ney served as an elected member of the U.S. House of Representatives for the 18th Congressional District in Ohio. In September 2006, the Department of Justice charged Ney with conspiring with several individuals (Jack Abramoff, Neil Volz, Tony Rudy, Michael P.S. Scanlon, an unnamed Congressional staffer, and an unnamed foreign businessman) to use mail and interstate wire communications to deprive the public of the honest services of Ney and his staff, to commit false statements, and to aid and abet a violation by former Congressional staff member Volz of the one-year lobbying ban. The Department also charged him with making false statements on Government forms by concealing and misrepresenting his receipt of items of value from his co-conspirators.

The facts supporting these charges are as follows. From 2000 through April 2004 Ney and members of his staff solicited and accepted items of value from the foreign businessman, Abramoff, Scanlon, Volz, Rudy, and other lobbyists working for Abramoff with the intent to be influenced and induced to take a series of official actions. The items that Ney solicited and accepted from Abramoff and other lobbyists included the following: 1) all-expense-paid trips and reduced-price trips to Scotland to play golf, to New Orleans to gamble and vacation, and to Lake George, New York to vacation; 2) meals and drinks at Washington, D.C. restaurants; and 3) tickets to use Abramoff's box suites to attend sporting events. In exchange, Ney supported or opposed legislation at Abramoff's request.

Ney also accepted an all-expense-paid trip to London to meet with the foreign businessman to discuss strategies to alter U.S. laws prohibiting the businessman from selling airplanes and parts in a foreign country. During the trip, the foreign businessman gave Ney and his staff thousands of dollars in gambling chips to use at casinos. Ney won additional money while gambling. He and his staff brought the money into the U.S., but he failed to report to Customs Service officials the total amount that he brought in.

Finally, Ney allowed and encouraged Volz, his former Chief of Staff, to lobby Ney and his staff on various issues from February 2002 through February 2003. Ney knew that such activity was in violation of the one-year lobbying ban. Volz had left Government service in February 2002.

The second charge includes Ney's false statements on Government forms with regard to the trips paid for by his co-conspirators. On his travel disclosure form, which he filed with the U.S. House of Representatives, Ney substantially under-reported the expenses paid by Abramoff and his clients for the golf trip to Scotland, and he mischaracterized the purpose of the trip. In connection with the trip to London, he underreported on his travel disclosure form the expenses that had been paid by private sources.

The second charge also encompasses false statements he made on two of his annual financial disclosure statements. On his 2002 statement he mischaracterized the purpose of the Scotland trip and failed to disclose as gifts the golf expenses as well as the tickets, meals, and entertainment provided by Abramoff and the other lobbyists working with Abramoff. On his 2003 statement he failed to disclose trips, tickets, meals, and entertainment provided by Abramoff and the other lobbyists working with Abramoff, including gifts of free travel, accommodations, and other expenses associated with trips that Ney took to Lake George, New York and New Orleans, Louisiana. He understated his receipt of gifts and omitted as the source of those gifts the foreign businessman by reporting that he had won $34,000 playing a game of chance at a casino. He also intentionally failed to include thousands of additional dollars he received.

Ney pleaded guilty in October 2006 to one count of a violation of 18 U.S.C. § 371, conspiracy to commit multiple offenses including honest services mail and wire fraud (18 U.S.C. §§ 1341, 1343, and 1346), making false statements (18 U.S.C. § 1001), and violations of his former chief of staff's one-year lobbying ban (18 U.S.C. § 207(e)). He also pleaded guilty to one count of making false statements to the U.S. House of Representatives in violation of 18 U.S.C. § 1001(a)(2). In January 2007 he was sentenced to 30 months in prison to be followed by two years supervised release. He was also fined $6,000, ordered to pay a special assessment of $200, and ordered to perform 600 hours of community service for each year of supervised release.

The Public Integrity Section of the Criminal Division of the Department of Justice handled the prosecution.

10. United States v. Roger G. Stillwell

Roger G. Stillwell, an employee of the Department of the Interior, was the desk officer for the Northern Mariana Islands from 2001 to August 11, 2006. In the 1990s, he had been a Washington-based consultant for the territory. It was during this time that he met Jack Abramoff, a Washington lobbyist. Abramoff was helping the islands resist congressional efforts to establish minimum wage and immigration laws in the territory. The governor of the territory at that time asked Stillwell to teach Abramoff the history of the islands in preparation for the lobbying campaign.

During this time Stillwell and Abramoff developed a personal friendship. It was also during this time that Abramoff began giving Stillwell and his family sporting and concert tickets. Stillwell offered to pay for the items, but Abramoff would tell Stillwell that the tickets were for unused seats and he wanted to give them to a friend.

When Stillwell became an employee of the Department of the Interior, the gift-giving did not stop. In 2003 he accepted from Abramoff tickets to a Washington Redskins game and to a Simon and Garfunkel concert. The total value of these tickets was $482. He falsely certified on his confidential financial disclosure report that he had not received gifts totaling more than $285.

Stillwell was charged with one count of falsely certifying on his financial disclosure report that he had not received any reportable gifts, a violation of 18 U.S.C. § 1018. In August 2006 Stillwell pleaded guilty to violating 18 U.S.C. § 1018. In January 2007 he was sentenced by the District Court of the District of Columbia to two years probation and fined $1,000.

The Public Integrity Section of the Criminal Division of the Department of Justice handled the prosecution.

11. United States v. Randall "Duke" Cunningham

Randall "Duke" Cunningham was the U.S. Representative from the 50th Congressional District in California from 1991 to 2005. During his service as a U.S. Representative, Cunningham accepted numerous bribes from several co-conspirators in exchange for taking official action to influence the appropriation of funds and the execution of

Government contracts in ways that benefited two of the co-conspirators, who were majority owners of defense contracting companies. Specifically, he sold his home in Del Mar, California at an artificially inflated price to a defense contractor whom he later helped obtain Government contracts. Another defense contractor paid off the mortgage on Cunningham's new home in Rancho Santo Fe. A third co-conspirator made the down payment on Cunningham's condominium in Arlington, Virginia. Defense contractors also purchased a yacht and a Rolls Royce for Cunningham, paid for a graduation party for his daughter, and paid for jewelry, home furnishings, and travel and hotel expenses. Cunningham did not disclose these benefits on his annual financial disclosure reports filed with the U.S. House of Representatives.

In November 2005 Cunningham pleaded guilty to committing tax evasion and to conspiring to commit bribery, honest services fraud, and tax evasion. In March 2006 he was sentenced to 100 months in prison to be followed by three years' supervised release. He was also ordered to pay $1,804,031.50 in restitution for back taxes, penalties and interest owed to the Government and to forfeit an additional $1,851,508 in U.S. currency based upon the cash payments he received during the conspiracy.

The Southern District of California handled the prosecution.

12. <u>United States v. Karla R. Kronstein</u>, <u>United States v. Michael G. Kronstein</u>, and <u>United States v. Kenneth N. Harvey</u>

Kenneth N. Harvey was the chief of the Acquisition Logistics and Field Support Branch within the U.S. Army Intelligence and Security Command (INSCOM) at Fort Belvoir , Virginia. He was responsible for recommending the award, modification, and payment of maintenance and logistics contracts in support of INSCOM missions throughout the world. Michael G. Kronstein was the owner and chief executive officer of Program Contract Services, Inc. (PCS). In November 1998, Harvey recommended that INSCOM award a sole-source maintenance and logistics contract to PCS. Following the contract award, Harvey recommended various modifications to the contract, many of which increased the total contract payout to Mr. Kronstein's company. Harvey also reviewed and approved payments to PCS.

In exchange for these acts, Mr. Kronstein caused payments totaling more than $40,000 to be made to Harvey's spouse and third parties for Harvey's benefit. On four occasions, Mr. Kronstein directed his wife Karla to write the checks for these payments.

Mr. Kronstein also offered Harvey employment with PCS at the same time Harvey oversaw a final modification to the contract. Harvey concealed the payments and the offer of employment from his superiors at INSCOM.

In October 2006 Karla Kronstein pleaded guilty to violating 18 U.S.C. § 209, illegally supplementing the salary of a Government employee. She was sentenced to three years probation and ordered to pay a $25 special assessment. Pursuant to the plea agreement, Karla waived her testimonial spousal privilege and testified at trial against her husband and Harvey.

In December 2006 a Federal jury convicted Michael Kronstein and Harvey of two counts each of honest services wire fraud and one count each of bribery. In March 2007 Michael Kronstein was sentenced to 70 months in prison, and Harvey was sentenced to 72 months in prison. Both defendants were also sentenced to three years of supervised release and jointly ordered to pay more than $383,000 in restitution.

The Public Integrity Section of the Criminal Division of the Department of Justice handled the prosecution.

13. United States v. Lester M. Crawford

Over a period of years, Lester M. Crawford held several senior positions within the Food and Drug Administration (FDA): Deputy Commissioner between February 2002 and March 2004, Acting Commissioner between March 2004 and July 2005, and finally Commissioner between July 2005 and September 2005, when he resigned. As a senior FDA employee, he was required to file annual public financial disclosure reports (SF 278). In February 2005 when he was selected for the post of Commissioner, he was required to file with the Senate committee hearing his nomination a nominee SF 278 and a Statement for Completion by Presidential Nominees. On the SF 278, he was required to list assets having a value that exceeded $1,000 and that either he or his wife held during the applicable reporting period. He was also required to disclose any assets that produced more than $200 in income during the reporting

period. Any FDA employee who was required to file an SF 278 could not hold a financial interest, such as stock or stock options, in a "significantly regulated industry." Federal regulations define such industries as organizations for which the sales of products regulated by the FDA constitute ten percent of more of annual gross sales in the organization's previous year.

During the relevant time periods, Crawford and/or his wife owned stock or stock options in Pepsico, Sysco, Kimberly-Clark, and Embrex, all of which were significantly regulated organizations. On the SF 278 and in an e-mail to an agency ethics official, Crawford failed to disclose his and his wife's ownership of this stock. In July 2004, he filed an SF 278 in which he did list the Sysco and Kimberly-Clark stock. But when an agency ethics official later inquired about his ownership of the stock, Crawford responded in an e-mail that he had sold the stock. In fact, he had not sold the stock. In February 2005, he did not disclose on his nominee SF 278 his exercise of Embrex stock options or the ownership of Sysco or Kimberly-Clark stock. He also did not disclose his exercise of the Embrex options on his February 2005 Statement to the Senate Committee. The omissions on the SF 278s and in the e-mail were the basis of a false writings charge.

A conflict of interest charge arose out of his and his wife's ownership of Sysco and Pepsico stock. He was the Chairman of the FDA's Obesity Working Group (OWG). In 2004 he and the OWG's Vice Chairman submitted a report on obesity to the FDA Commissioner at the time. The report contained many recommendations, including encouraging manufacturers to re-label serving sizes on products such as sodas. Pepsico is a manufacturer of sodas and snack food, and Sysco is a manufacturer of food products. By participating in the working group and its recommendations, he participated personally and substantially in a particular matter in which he and his wife had a financial interest.

In October 2006 Crawford pleaded guilty to violating 18 U.S.C. § 208, participating in a particular matter in which he and his wife had a financial interest, and 18 U.S.C. § 1018, making false writings by failing to disclose his and his wife's ownership of certain stock and stock options on his public financial disclosure form and in an e-mail. In February 2007 he was sentenced to three years of supervised probation. He was

also ordered to pay a fine of $90,000, perform 50 hours of community service, and pay the costs of his probation.

The District of Columbia handled the prosecution.

14. United States v. Bonnie Murphy

Bonnie Murphy, a Defense Department employee, deployed to Iraq in December 2003 as part of a Defense Reutilization and Marketing Service (DRMS) team. She and other DRMS employees were responsible for managing and disposing of surplus DoD property, including hazardous waste. From July through December 2004, she accepted several pieces of gold jewelry worth approximately $9,000 from the owners and employees of an Iraqi contracting company.

Between July and October 2004, this company received three service contracts from the U.S. Army. Before each contract award, Murphy wrote a statement of work requesting that the U.S. Army hire a contractor to perform the disposal of hazardous waste, the removal of contaminated soil, and the removal and storage of used lithium batteries. She verbally recommended that the Iraqi company be hired for each contract and she wrote a sole source justification letter recommending that it receive the lithium battery contract without undergoing a competitive bidding process. She also oversaw each contract -- authorizing the company to do work, monitoring its performance, and certifying its invoices.

In November 2006 Murphy pleaded guilty to a violation of 18 U.S.C. § 209, accepting illegal compensation from the Iraqi contractor for helping it obtain U.S. Army contracts. In March 2007 she was sentenced to one year probation and a $1,500 fine.

The Public Integrity Section of the Criminal Division of the Department of Justice handled the prosecution.

15. United States v. Jane G. Selby

Jane G. Selby was a manager at the Bonneville Power Administration (BPA). Knowmadic was a company that sold software and software-related services to BPA. A Federal investigation revealed that while employed by the BPA, Selby solicited Knowmadic to hire her husband as a salesman and then used her influence at BPA to advocate for the expanded use of the contractor's software

products. In addition, she participated in matters related to BPA's use of Knowmadic software as part of a scheme to defraud BPA. Finally, the investigation revealed that she made false statements in connection with her dealings with Knowmadic, attempted to obstruct the investigation, and tampered with a witness.

In December 2006, a Federal jury convicted Selby of violations of 18 U.S.C. §§ 208 (participating personally and substantially in a matter in which she had a financial interest), 1001 (making a false statement) and 1343 (wire fraud). In May 2007 she was sentenced to five years probation on the condition, among others, that she reside in a Bureau of Prisons contract facility for four months.

The District of Oregon prosecuted the case.

16. <u>United States v. Michael J. Peters</u>

Michael J. Peters worked as a Senior Analyst in the Office of the Administrator for NASA. His job was to evaluate and recommend financial software so that NASA's senior leadership could access the various NASA centers' budgets and expenditures from a central location. Peters recommended that NASA purchase a software product from Open System Sciences (OSS). At the same time, OSS was paying Peters, through an intermediary, $25,500 to develop and market the OSS software product. In addition, Peters intentionally omitted information about OSS's payments to him and disguised the payment on his public financial disclosure report (SF 278). He was also required to file a Questionnaire for National Security Position, which required him to list all employment activities, including part-time work. He did not list OSS or the intermediary on this form.

In October 2006, a Federal grand jury indicted him on three counts: (1) conspiracy to accept gratuities, a violation of 18 U.S.C. §§ 371 and 201(c)(1)(B); (2) making false statements, a violation of 18 U.S.C. § 1001(a)(2); and (3) engaging in acts affecting a financial interest, a violation of 18 U.S.C. § 208(a). In November 2006 Peters pleaded guilty to the charges of making false statements and of engaging in acts affecting a financial interest. In March 2007 he was sentenced to two years

probation, a fine of $25,500, and 500 hours of community service.

The District of Columbia handled the prosecution.

17. United States v. Michael Rzeplinski, United States v. Connie Davidson, and United States v. Kirsten Davidson

Michael Rzeplinski served as a programs director for the General Services Administration (GSA) and as a supervisory engineer for the U.S. Army. Connie Davidson was a GSA employee who resided with Rzeplinski. Kirsten Davidson is Connie's daughter. In February 2002, Rzeplinski caused a project to be awarded to Aquila Management to provide IT-related services at Fort Monmouth, New Jersey. He asked Aquila Management to hire Kirsten to perform computer-related work under his direction. The company then hired her, but she did not perform any work. Between February 2002 and February 2005, Aquila Management billed the Army, and Rzeplinski approved, the payment of approximately $283,000 in claims for work that Kirsten did not perform.

Rzeplinski also recommended that a GSA IT-related services task order be awarded to PCC Technology Group, Inc. He asked that company to hire Kirsten to perform computer-related work under his direction. The company did hire her, but again she performed no work. Between January 2003 and October 2005, PCC was paid approximately $555,710 on this contract and on a separate GSA contract as a subcontractor for work that Kirsten never performed.

Rzeplinski caused PCC to hire a company called RZED Engineering Services (ZED), a sole proprietorship he controlled, as a subcontractor. From June 2002 until October 2005, PCC mailed monthly checks in the amounts of $4,000 to $4,500 to Rzeplinski. He received a total of $151,500, but ZED never performed any work as a subcontractor.

Rzeplinski failed to file Federal income tax returns for the years 2002, 2003, and 2004, even though he did have taxable income during those years.

Kirsten Davidson admitted to Federal officials that she knew Rzeplinski agreed to get her jobs with both Aquila and PCC, that she was on the payrolls of the two companies, and that she did not perform any work for any pay. She received approximately $282,000 as a result of

these arrangements.

Connie Davidson was appointed to be the assistant contracting officer's representative on the task order awarded to PCC. Her job duties included the responsibility to report to GSA any instances in which PCC made claims for payment for work that had not been performed. She admitted to Federal officials that in her capacity as a GSA employee she was aware that Rzeplinski had recommended the award of the task order to PCC and that he intended to have PCC hire her daughter Kirsten to perform work on the contract. Connie Davidson also knew that PCC was paying her daughter and that her daughter did not perform any work for PCC.

In August 2006 the three defendants pleaded guilty to charges in connection with these activities, and they were sentenced in January 2007. Rzeplinski pleaded guilty to tax evasion and to conspiracy to defraud the United States by making false claims. He was sentenced to 46 months in prison and ordered to pay $862,710 in restitution. Kirsten Davidson pleaded guilty to conspiracy to defraud the United States by making false claims. She was sentenced to 18 months in prison and ordered to pay $290,647 in restitution. Connie Davidson pleaded guilty to aiding and abetting the submission of false claims. She was sentenced to 12 months in prison and ordered to pay $395,710 in restitution.

The District of New Jersey handled the prosecution.

18. United States v. Dr. William L. Smith, Sr.

From August 1997 to January 2004 Dr. William L. Smith, Sr. was employed by the National Aeronautics and Space Administration (NASA) at Langley Research Center. He held various positions, and in 1999 he began serving as Senior Scientist, Atmospheric Sciences Competency, and as Principal Investigator for major airborne and satellite experiment programs. The latter position included responsibility for contracts awarded under the programs.

In 2001, while serving as Senior Scientist and Principal Investigator for the contracts between NASA and the University of Wisconsin, Dr. Smith allegedly engaged in negotiations with the University of Wisconsin for a Distinguished Professor position following his retirement from NASA, in violation of 18 U.S.C. § 208(a).

In June 2006 the United States and Dr. Smith entered into a civil settlement under which Dr. Smith agreed to pay the United States a $7,500 civil penalty and the United States agreed to release Dr. Smith from any civil claims it had against him under 18 U.S.C. § 208. Under the terms of the agreement, Dr. Smith did not admit liability.

The Civil Division of the Department of Justice handled the case.

19. United States v. John R. Van Rosendale

John R. Van Rosendale, an employee of the Department of Energy, was required by 5 U.S.C. app. § 104 to file a termination public financial disclosure report when he left his Government position. According to the United States, he knowingly and willingly failed to do so.

The United States and Mr. Van Rosendale entered into a civil settlement under which Mr. Van Rosendale agreed to pay a $2,500 civil penalty.

The Civil Division of the Department of Justice handled the case.